**In re JTS CORPORATION, Debtor.**

**Suzanne L. Decker, Trustee, Plaintiff,**

**v.**

**David T. Mitchell, Jack Tramiel, Sirjong Lal "Jugi" Tandon, Cooley Godward, LLP, Matthew W. Sonsini, Andrei M. Manoliu and Anna B. Pope, Defendants.**

**Bankruptcy No. 98–59752–MM.
Adversary No. 00–5423.**

United States Bankruptcy Court,
N.D. California.

Sept. 30, 2003.

John Walshe Murray, Law Offices of Murray and Murray, Cupertino, CA, for Debtor.

Jeffrey C. Wurms, Daniel Rapaport, Wendel, Rosen, Black and Dean, Oakland, CA, for Plaintiff.

Thomas A. Johnson, Law Offices of Blakeley and Blakeley, Irvine, CA, for Creditor Committee.

**OPINION**

MARILYN MOGAN, Bankruptcy Judge.

### INTRODUCTION

The trustee for the bankruptcy estate of JTS Corporation alleges that certain JTS directors and other controlling persons removed millions of dollars from the corporation that otherwise belonged to the bankruptcy estate. The trustee's second amended complaint asserts claims against the director defendants for breach of fiduciary duty, preference, fraudulent conveyance, equitable subordination, avoidance of transfers, illegal redemption of shares and alter ego liability arising out of five distinct business transactions. The complaint also asserts claims of intentional breach of fiduciary duty and legal malpractice against the attorneys that represented JTS during the time when the transactions occurred. Finally, the trustee alleges derivative theories of recovery including unfair business practices, conspiracy and aiding and abetting.

Both plaintiff and defendants seek summary judgment with respect to multiple claims for relief. For the reasons set forth, partial summary judgment is granted only with respect to the alter ego claim and the claims related to the Atari bridge loans.

### PROCEDURE ON SUMMARY JUDGMENT

Summary judgment obviates the need for trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions and declarations that are part of the record. Fed. R.Civ.P. 56, Notes of Advisory Committee on Rules. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the same evidentiary tools to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the non-moving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### BACKGROUND

JTS Corporation designed, manufactured, and marketed hard disk drives for personal computers. Through merger, JTS acquired the assets of Atari Corporation in 1996, which consisted of $15 million in cash, $55 million attributable to intellectual property, and eight real properties with a book value of $10 million. Following the merger, shares of JTS stock were publicly traded on the American Stock Exchange.

In 1997, the disk drive industry suddenly declined and sales plummeted. To survive, JTS's board of directors decided to pursue a business model based on a low-cost, higher-performance disk drive. Despite management's efforts, the company

was unable to recover. On November 17, 1998, the company was forced into bankruptcy through an involuntary petition. JTS then filed a voluntary petition for relief under Chapter 11 on December 4, 1998. JTS scheduled assets of $4.2 million and liabilities of $136 million. On January 29, 1999, the court ordered the case converted to Chapter 7. For the purposes of these motions, insolvency is presumed.

At all relevant times, defendants David Mitchell, Sirjang Lal Tandon, and Jack Tramiel were directors of JTS. Defendant Cooley Godward, LLP is a law firm that served as counsel to JTS, and defendants Matthew Sonsini, Andrei Manoliu, and Anna Pope were attorneys with the Cooley firm. All other defendants to the complaint have settled with the trustee and have been dismissed.

Because each of the underlying business transactions serves as the basis for more than one claim, this opinion is organized according to those transactions. Facts regarding each transaction are discussed as appropriate below, and any factual disputes are noted. Objections to evidence are only considered where essential to the court's decision and are otherwise deemed moot. Initially, however, this opinion reviews the trust fund doctrine under Delaware law because it pervades the trustee's theories of recovery for breach of fiduciary duty.

## DISCUSSION

### I. *Liability For Breach of Fiduciary Duty Turns on the Applicability and the Parameters of Delaware's Trust Fund Doctrine.*

#### A. *Both the Trust Fund Doctrine and § 144 of Delaware's General Corporation Law Could Apply to the Facts of this Case.*

■ The trustee asserts that because JTS was insolvent at the time of the challenged transactions, the trust fund doctrine supplies the legal standard under which the alleged breaches of duty should be judged. The trust fund doctrine provides that, upon insolvency, a corporation's assets become subject to a trust for the benefit of creditors. The doctrine's source has been traced to *Wood v. Dummer*, 30 F.Cas. 435 (D.Me.1824), where Circuit Justice Story concluded that the capital stock of a dissolved bank, which had been distributed to the bank's stockholders, was held as a trust fund for payment of the bank's debts. Reasoning that, upon dissolution, the claims of creditors are superior to claims of stockholders, Justice Story found that the equitable imposition of a trust would allow the bank's creditors to follow the capital stock into the hands of the stockholders, even though the corporation had dissolved. *Id.* at 436–37. The roots of the doctrine, then, lie in its use as a tool to enforce the absolute priority rule requiring that creditors be paid ahead of equity. Today, Justice Story's use of equitable powers to create a trust and avoid injustice is reflected in the remedy known as a constructive trust.

■ Where the trust fund doctrine is strictly applied, protection of the trust res, the corporate assets, is of paramount importance. *New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 10, 110 N.E.2d 397 (1953)(directors were personally liable when they failed to obtain full value at an auction of corporate assets). Even though loss may result from the directors' poor judgment, creditors are entitled to recover their loss from the directors. *Id.* The trust fund doctrine, however, has been widely criticized. According to one authority, "no concept has created as much confusion in the field of corporate law as has the 'trust fund doctrine.'" 15A Fletcher Cyclopedia of Pri-

vate Corp., § 7369. Only a very few cases have followed the doctrine in this strict sense. *See, e.g., Saracco Tank & Welding Co., Ltd. v. Platz,* 65 Cal.App.2d 306, 315, 150 P.2d 918, 923 (1944); *Gantenbein v. Bowles,* 103 Or. 277, 292, 203 P. 614, 619 (1922); *Wood,* 30 F.Cas. at 435; *Weiss,* 305 N.Y. at 1, 110 N.E.2d 397.

The defendants, by contrast, assert that § 144 of the Delaware General Corporation Law, 8 Del. C. § 144, dictates that fairness is the appropriate standard of review. Section 144, adopted in 1967, was developed to ameliorate the common law rule that transactions between a corporation and one of its directors were void per se. Under the Delaware statute, the self-interest of a director does not necessarily render a transaction void. It provides:

No contract or transaction between a corporation and 1 or more of its directors or officers ... shall be void or voidable solely for this reason ..., if:

1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

2) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

8 Del. C. § 144. According to Delaware courts, this section transfers the burden of proving the fairness of a transaction. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995); *Cooke v. Oolie,* 1997 WL 367034, at *8–9 (Del.Ch. June 23, 1997). Without director or shareholder ratification, the interested director has the burden of establishing that the transaction was fair to the corporation. *See* § 144(a)(3). But, if the shareholders or a majority of the disinterested directors ratify the transaction with full knowledge of the interested relationship, the burden of proof shifts to the party challenging the transaction to demonstrate that the transaction is unfair. *See* § 144(a)(1) and (2).

■ Here, many of the claims involve interested director transactions that occurred while JTS was insolvent and allegedly resulted in harm to JTS's creditors by dissipating assets that would otherwise be available for distribution. Under these facts, both § 144 and the trust fund doctrine could apply. The trustee, who opens with the trust fund doctrine, argues that § 144 does not affect the trust fund doctrine as it applies to insolvent corporations. The defendants start from the premise that § 144 applies to all interested director transactions and assert that insolvency does not change that fact. No case law answers the question whether § 144 supplants the application of the trust fund doctrine. The task, then, is to determine whether these two independently developed legal concepts actually conflict and, if so, which controls the facts of this case.

B. *The Evolution of the Trust Fund Doctrine in Delaware is Based on Fairness and Does Not Support Per Se Liability.*

The trustee relies primarily on *Bovay v. H.M. Byllesby & Co.,* 38 A.2d 808 (Del.

1944), to argue that, upon insolvency, new duties arise for boards of directors that did not previously exist, including unyielding duties not to harm the corporation, not to profit from a transaction with the corporation, not to repay a corporate debt owed to a director ahead of other creditors, and an affirmative duty to give equal value. Delaware's adherence to the trust fund doctrine, she urges, strictly forbids any breach of these duties without regard to the fairness of the transaction. However, a careful reading of *Bovay,* and other early Delaware cases discussing the trust fund doctrine, reveals that the Delaware courts have always been uneasy with the idea that an insolvent corporation's assets should be held in strict trust for the benefit of its creditors.

For example, in *MacKenzie Oil Co. v. Omar Oil & Gas Co.,* 120 A. 852 (Del.Ch. 1923), the court upheld the validity of a Delaware statute that authorized creditors to request the appointment of a receiver for an insolvent corporation. The court found that the statute created a new substantive right. Although the court characterized the creditors' new right as "somewhat in the nature of a trust," it was careful to note that the statute did not "in a strict sense ... create a trust." *Id.* at 858. Further, and perhaps more significantly, the court pointed out that, absent the statute, insolvency would *not* convert corporate assets into a "quasi trust for the benefit of creditors." *Id.* at 857.

The Delaware courts' next occasion to take up the trust fund doctrine occurred in *Asmussen v. Quaker City Corp.,* 156 A. 180 (Del.Ch.1931). The issue in *Asmussen* was whether the directors of an insolvent corporation on the verge of dissolving could pay the claims of certain non-insider creditors without paying other non-insider creditors. Referring to the lack of clarity surrounding the trust fund doctrine, the court remarked that the use of the word "trust" took the law beyond what was warranted in describing the relationship between an insolvent corporation and its creditors. *Id.* at 180–81. The court concluded that "equity will not treat the assets of an insolvent corporation as a trust fund for the benefit of creditors in the sense that one creditor has a right to be paid his debt pari passu with all other creditors similarly situated." *Id.* at 183. In reaching this conclusion, the court reasoned that a corporate creditor "has no just right slothfully to sit quietly in possession of his claim and expect, in case his debtor becomes insolvent, the courts to protect him through the instrumentality of a judicially created trust." *Id.* at 182. However, the court left open the question whether principles of fairness might justify exceptions from the general rule, especially where the preferred creditor is a corporate insider. *Id.* at 181–82.

In *Pennsylvania Co. for Insur. on Lives and Granting Annuities v. South Broad Street Theatre Co.,* 174 A. 112 (Del.Ch. 1934), the court confronted the very issue that *Asmussen* left open: whether the directors of an insolvent corporation on the eve of collapse could make payments to a creditor who was also a director of the corporation. Because the chancellor believed it was unfair to prefer a corporate insider, he found that payments to the director were void to the extent that the director-creditor received more than his pro-rata share. The chancellor reasoned that "applied common honesty" prohibited the director of a sinking corporation from taking advantage of his position "by rushing ahead to a place in the life boat, ... ahead of his fellow passengers." *Id.* at 116. The chancellor discussed the trust fund doctrine only to the extent that he recognized it as one name tag applied to justify a rule that director-creditors of an insolvent company may not enjoy a prefer-

ence over other creditors. He noted that the "so-called" doctrine was not inconsistent with his holding because it arose from principles of honesty and fairness. *Id.*

Even in *Bovay*, it is apparent that the court's decision was guided by fairness. In *Bovay*, the bankruptcy trustee of a corporate debtor sought to recover money that had been paid through self-dealing and fraud. The complaint alleged that the debtor's officers and directors paid the defendants in violation of their fiduciary duties to the debtor. The lower court had dismissed the complaint finding that the directors were not trustees of an express trust and that the statute of limitations for actions at law barred the suit.

The supreme court reversed the dismissal. Citing *Asmussen*, the court paid lip service to the trust fund doctrine:

> An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors.... The fact which creates the trust is the insolvency, and when that fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency.

*Bovay*, 38 A.2d at 813. The court never described the substance of those "very different principles" but instead discussed several cases where directors were treated as trustees due to extraordinary circumstances, most often involving self-dealing. From these cases, the court concluded that, under varying circumstances, courts will treat directors of corporations as trustees when directors have taken "such advantage of their position of trust as public policy could not tolerate." *Id.* For example, the court stated that directors are not trustees in a strict and technical sense but may be treated as such when they have "unlawfully profited through breach of

duty, and at the expense of the corporation." *Id.* Significantly, this conclusion was not limited to the circumstance of insolvency. Rather, the court treated insolvency as an important factor that could equitably lead to characterizing directors as trustees. "[W]here directors are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but as serious breaches of trust ... especially where insolvency of the corporation is the result of their wrongdoing." *Id.* at 820. It is apparent that the court was swayed by the inequity that resulted from a combination of two factors before it: personal profit by the insiders and harm to the corporation leading to its insolvency.

C. *The Current Legal Standard Governing Trust Fund Doctrine Claims in Delaware Requires Consideration of Fairness.*

In the years following *Bovay*, Delaware law has not followed an uncompromising trust fund doctrine. Although the supreme court has not had an opportunity to discuss the issue further, the lower courts, while still citing *Bovay*, have generally turned away from describing directors of an insolvent corporation as guardians of a trust fund for the benefit of creditors. Delaware's shift in approach recognizes, instead, that insolvency creates an exception to the general rule that a corporation owes no fiduciary duties to its creditors. *See Geyer v. Ingersoll Publications*, 621 A.2d 784, 787 (Del.Ch.1992).

While the trust fund doctrine and the insolvency exception both recognize that the directors of an insolvent corporation owe duties to the corporation's creditors, the two approaches differ significantly. The trust fund doctrine provides the

courts with trust remedies as a means to enforce the absolute priority rule. In properly distributing an insolvent corporation's assets, the doctrine's trust remedies make sense. However, as the *Asmussen* court recognized early on, trust principles create problems when they are applied outside the distribution context. The insolvency exception recognizes that the fact of insolvency fundamentally alters the relationship between a corporation, its shareholders and its creditors. As a result, a new fiduciary relationship arises running from the directors of the insolvent corporation in favor of the corporation's creditors. The rationale for this approach acknowledges that creditors need protection even if an insolvent corporation is not liquidating, because the fact of insolvency shifts the risk of loss from the stockholders to the creditors. While stockholders no longer risk further loss, creditors become at risk when decisions of the directors affect the corporation's ability to repay debt. This new fiduciary relationship is certainly one of loyalty, trust and confidence, but it does not involve holding the insolvent corporation's assets in trust for distribution to creditors or holding directors strictly liable for actions that deplete corporate assets.

The earliest indication that Delaware was adopting the insolvency exception surfaced in *Harff v. Kerkorian*, 324 A.2d 215 (Del.Ch.1974). There, the court announced that directors owed no fiduciary duties to a debenture holder absent "special circumstances" such as fraud, insolvency or violation of a statute. *Id.* at 222. Similarly, in *Holloway v. Sharon Land Co.*, 1977 WL 2573 (Del.Ch. Aug.25, 1977), the court invalidated certain preferential payments made by an officer and fifty percent shareholder to himself while the corporation was insolvent. The court stated that "Delaware law is clear that corporate officers, as fiduciaries, may not profit

from their position of trust and that when challenged they bear the burden of proving that transactions with the corporation, in which they have a personal interest, are fair." *Id.* at *3, citing, *Bovay*, 38 A.2d at 808.

Recently, the court in *Geyer v. Ingersoll Publications*, 621 A.2d 784 (Del.Ch. 1992), was asked to determine the precise point in time when a corporation's directors began to owe fiduciary obligations to creditors. To support its conclusion that fiduciary duties to creditors arise upon a corporation's insolvency in fact and not only after statutory dissolution proceedings are filed, the court pointed to Bovay's language that "the fact which creates the trust is insolvency." Despite reliance on Bovay's reference to a trust, the Geyer court clearly analyzed the case before it in terms of the insolvency exception and the advent of fiduciary duties owed to creditors.

Most recently, in *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386 (Del.Ch.1999), the court noted both the trust fund language from *Bovay* and *Geyer's* discussion of the insolvency exception. Without any real discussion of the differences between the two analytical frameworks, it is clear that the court considered the transaction at issue in light of the directors' need to fulfill fiduciary duties to unsecured creditors. In that case, a majority shareholder, who was also a secured creditor of an insolvent holding company, foreclosed on its collateral, which consisted of the stock of an operating subsidiary. The minority shareholders alleged that the directors breached their fiduciary duty by allowing the foreclosure sale to go forward, despite the fact that the board negotiated for and obtained the majority shareholder/secured creditor's agreement to pay off the unsecured creditors. While the trust fund doctrine would dictate that board ap-

proval of the foreclosure was improper because it allowed the insider-creditor to receive payment ahead of unsecured creditors, the court found that the directors did not breach their duty because the transaction was fair as it assured full payment to the unsecured creditors.

This litany of cases demonstrates that Delaware has never relied on the trust fund doctrine in the strict sense. Despite continued references to *Bovay*, Delaware case law has followed the insolvency exception in shifting the duties of corporate directors. As a result, the trustee's reliance on *Askanase v. Fatjo*, 1993 WL 208440 (S.D.Tex.1993), is unpersuasive. The Texas court's conclusion that Delaware strictly follows the trust fund doctrine is at odds with Delaware precedent.

Delaware's recognition that the trust fund doctrine is limited to the application of remedies designed to assure fairness is consistent with the constructive trust concepts from which it arises. As one authority has noted, a constructive trust is a fiction of equity. It is "a formula through which the conscience of equity finds expression." Bogert, *The Law of Trust and Trustees*, § 471 at p. 8 (rev.2d ed.). There is no true intent to create a trust, rather it is a device used to work out an equitable result when a party has gained possession of property through unjust or unlawful means. *Id.* at p. 5.

Moreover, present day reality simply does not lend itself to strict application of the trust fund doctrine. Numerous tests determine insolvency and, often, insolvent corporations are not on the verge of liquidation. Seemingly insolvent entities continue in business for extended periods of time and may attempt to restructure or reorganize outside of bankruptcy. Thus, there is a need to consider the fiduciary duties of directors beyond the narrow confines of the trust fund doctrine, which De-

laware has accomplished through adoption of the insolvency exception. Delaware courts historically have balanced the fairness of transactions with the interests of a corporation's constituent groups. Because the fairness analysis is not significantly different than the standard set out in § 144(a), I conclude that § 144(a) and the so-called "trust fund doctrine" as interpreted in Delaware are not in conflict.

D. *Section 144(a)(1) of Delaware General Corporation Law Is Not Applicable to Transactions Affecting Creditors' Rights.*

■ The remaining question is whether the ratification provisions of § 144(a)(1) require the trustee to establish that the challenged transactions were unfair before they are voidable. As the trustee aptly points out, ratification provisions like § 144(a)(1) are intended to allow the parties generally affected or harmed by the board's business decisions to absolve the board of directors of any impropriety in their conduct, but corporate or shareholder ratification does not apply to creditors who would be prejudiced thereby. *In re Western World Funding, Inc.*, 52 B.R. 743, 773 (Bankr.D.Nev.1985), *citing, McCandless v. Furlaud*, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935). Because creditors cannot protect themselves through the selection of the company's managers, they should not be bound by provisions that limit the scope of those managers' duties. *In re Ben Franklin Retail Stores, Inc.*, 225 B.R. 646, 652 (Bankr.N.D.Ill.1998).

In sum, the legal standard to be applied in addressing the trustee's breach of fiduciary duty claims requires the trustee to establish an interested director transaction. Once established, the defendants bear the burden of proving that the transaction was entirely fair to the corporation's constituent groups at the time it was au-

thorized. This standard does not require proof that the directors acted with evil intent to establish a breach of duty. Rather, an interested director is presumed to have acted in his own self-interest, absent proof that the transaction was fair. This test is no different from the standard set forth in § 144(a)(3) or that enunciated in *Holloway v. Sharon Land Co.*, 1977 WL 2573, at *3. With this standard in mind, the court examines the claims.

## II. Questions of Fact Preclude Summary Judgment on the Claims Related to the Sale of Real Property.

■ Upon merging with Atari, JTS became the owner of eight parcels of property scattered across Texas and California with a combined book value of $10 million. Shortly after the merger was completed, JTS decided to sell the parcels for operating funds. Defendant Tramiel, who had been the chairman of Atari's board of directors and, after the merger, became one of JTS's directors, offered to purchase the properties. Under the terms of the sale, JTS received $10 million, the properties' book value, plus it retained the right to repurchase the properties for one year following the sale. In return, Tramiel held title to the properties and also received the $1 million annual rental income that the properties generated. According to the trustee's expert, the fair market value of the eight properties was nearly $16 million at the time it was sold to Tramiel. The defendants insist that the property was worth no more than JTS received, namely $10 million plus a repurchase option.

### A. The First Claim for Relief–Breach of Fiduciary Duty.

The trustee seeks summary judgment on her first claim for relief because the trust fund doctrine dictates that Tramiel breached his fiduciary duties to JTS and its creditors when he purchased the eight parcels from the corporation for less than fair market value. She asserts that the purchase harmed JTS by reducing its net worth by nearly $6 million. She further argues that the evidence shows that Tramiel advanced his personal interests over those of JTS when he structured the transaction as a sale rather than a secured loan and when he refused to extend the repurchase option.

Under the standards discussed above, the trust fund doctrine does not automatically entitle the trustee to judgment if the property was conveyed to Tramiel for less than its fair market value. However, she has provided proof of an interested director transaction, which shifts the burden onto Tramiel to prove the transaction's fairness to the corporation. To defeat the trustee's motion for summary judgment, then, Tramiel needs to demonstrate that there is a genuine issue of fact regarding the transaction's fairness.

Although the defendants have not offered their own valuation expert to establish that the real estate sale was fair, they point out that the deadline for expert disclosure has not yet expired. They request time, pursuant to Fed.R.Civ.P. 56(f) to take the deposition of the trustee's valuation expert and to engage an expert of their own. Even without the benefit of their own expert, the defendants assert that the trustee's evidence of fair market value compared to book value is not enough to entitle the trustee to summary judgment. For example, the defendants point out that JTS was in urgent need of cash and sought a quick sale. Further, defendants note that by selling to Tramiel, JTS was able to sell all eight properties as a package and reduce the costs of sale. Construed in the defendants' favor, this evidence establishes that other factors must be weighed against the evidence of

fair market value to determine whether the sale was or was not entirely fair to JTS under the circumstances. Because this determination cannot be made on the sparse record currently before the court and, in light of the defendants' Rule 56(f) request to defer ruling based on the need for expert discovery, the trustee's motion for summary judgment as to her first claim for relief is denied without prejudice.

B. *The Second Claim for Relief— Fraudulent Conveyance.*

■ The trustee also alleges that Tramiel's purchase of the real properties for less than their fair market value while JTS was insolvent was a fraudulent conveyance under California law. In a curious twist, the only defendant against whom this claim is directed, Tramiel, has not moved for summary judgment on this claim. Nevertheless, the other director defendants have found it necessary to argue that Tramiel should be entitled to summary judgment on the second claim for relief because the other directors want to avoid indirect liability for the sale of the real property. They assert that, as a matter of law, the undisputed sales price of $10 million plus a repurchase option constitutes fair value.

While the court in *In re Calvillo*, 263 B.R. 214 (W.D.Tex.2000), found that it was reasonable to value a repurchase option by subtracting the fixed exercise price from the value of the property at the time of transfer, it also recognized that "valuation considerations are inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction." *Id.* at 220. Here, the trustee has offered expert testimony indicating that the fair market value of the properties was substantially greater than the consideration JTS received in return. Although the defendants

question the credibility of that evidence, I accept it as true in considering whether the defendants might be entitled to summary judgment. To the extent the outcome of this claim affects the derivative claims, the question whether JTS received reasonably equivalent value in exchange for the real properties must be resolved at trial.

III. *Questions of Fact Preclude Summary Judgment on the Claims Related to the NationsBanc–Series D/E Stock Exchange Transaction.*

■ In late 1997, one of JTS's major shareholders, Amber Arbitrage, agreed to participate in a plan to infuse cash into JTS. Amber, along with Mitchell, Tandon and Tramiel, collectively the Amber Group, placed $25 million in an escrow account. Pursuant to the plan, JTS established a second escrow account that contained $25 million of JTS Series D convertible stock. Each Series D share was convertible to 5,000 common shares of stock at an additional conversion price of $0.65 per share. Amber, as the Amber Group's largest contributor, retained authority to release funds from the cash escrow. Whenever Amber permitted JTS to draw down the cash escrow account, the Amber Group received a corresponding amount of Series D stock in exchange.

By November 1997, Amber had authorized the release of $13.4 million from the cash account. Thereafter, the price of JTS common stock plummeted to a level where it could be purchased for less than the conversion price of the Series D stock, leaving the Series D stock worthless. As a result, when JTS requested permission to use additional funds from the cash escrow, Amber refused, necessitating a search for funding from other sources. In February 1998, NationsBanc agreed to provide a $10 million line of credit to JTS if the Amber

Group provided collateral for the loan. While the Amber Group was unwilling to release further funds from the escrow directly to JTS, it was willing to allow the escrowed funds to be used as collateral for the NationsBanc loan. The Amber Group purchased $10 million in certificates of deposit with funds from the cash escrow account. NationsBanc also received a security interest in all of JTS's assets, and the Amber Group received a junior lien on JTS's assets to the extent that the certificates of deposit were drawn down.

As consideration for providing the certificates of deposit as collateral, JTS agreed to exchange the Series D stock for an equal number of shares of newly issued Series E convertible preferred stock. The main difference between Series D and Series E stock was a lower conversion price. Each Series E share was convertible to 5000 common shares at a conversion price of $0.10 per share, a price below JTS's then current trading price. At the time JTS issued the Series E stock, the discounted conversion price would have enabled the Amber Group to recover the $13.4 million it had lost when the Series D stock became worthless. However, the Series E stock was subject to a lock-up period that prevented exercise of the conversion rights prior to August 5, 1998. By the end of the lock-up period, the price of JTS's common stock had again dropped below the conversion price of the Series E shares.

### A. The Third Claim for Relief—Breach of Fiduciary Duty.

The trustee alleges that each member of the Amber Group breached fiduciary duties owed to JTS's creditor body by unfairly profiting from the NationsBanc–Series D/E transaction. The defendants assert that they are entitled to summary judgment on this claim, first, because the shareholders ratified the transaction and, second, because the transaction as a whole was intrinsically fair.

The defendants' ratification argument is not persuasive because the breach of fiduciary duty claims are based on the interests of JTS's creditor body. Moreover, the record only establishes that the shareholders ratified an amendment to the certificate of incorporation increasing the authorized number of shares of common stock; there is no evidence that the shareholders ratified the entire transaction.

In support of their argument that the transaction was fair to JTS, the defendants point to evidence establishing that JTS was in need of money and that the terms of the NationsBanc secured loan were dictated by Amber Arbitrage, not the other members of the Amber Group. Further, the defendants urge that the Series D/E exchange portion of the transaction was fair because the exchange was in consideration for Amber Arbitrage's agreement to make $10 million available to secure the NationsBanc loan. Finally, the members of the Amber Group assert that they did not unfairly profit from the transaction because they did not receive anything of value in light of the lock-up period that prevented them from converting their stock.

In opposition, the trustee argues that the NationsBanc–Series D/E transaction was unfair because the Amber Group obtained a lien on JTS assets that fully secured the group's $10 million guarantee of the NationsBanc loan. The trustee argues that the additional exchange of Series E stock for the worthless Series D stock was a windfall that was not justified by the value of its guarantee. In support of this argument, the trustee offers evidence, by way of expert testimony, that the Series E stock did have value at the time it was

exchanged for the worthless Series D shares.

Although the defendants object to the declaration of the trustee's valuation expert, the objection goes to the weight of the evidence. On summary judgment, the court is not allowed to weigh evidence or the credibility of the testimony. The non-moving party's evidence is to be believed and all reasonable inferences from that evidence must be drawn in the non-moving party's favor. In light of this standard, I conclude that the evidence offered by the trustee raises a question of fact regarding the entire fairness of the NationsBanc–Series D/E transaction. Summary judgment is not appropriate as to the third claim for relief.

### B. The Fifth Claim for Relief—Fraudulent Conveyance.

■ The trustee alleges that the defendants gave NationsBanc a lien on JTS's assets when the bank did not require or want the lien as consideration for the secured loan. Instead, she asserts, the lien was fraudulently conveyed to NationsBanc with intent to hinder, delay or defraud creditors. The defendants seek summary judgment on this claim because, they maintain, the trustee has no evidence of fraudulent intent. This argument is not compelling in light of the deposition testimony of Joseph Prezioso, JTS's CFO at the time of the NationsBanc transaction. Prezioso's testimony suggests that NationsBanc did not request the lien, rather the Amber Group insisted on the blanket lien, in part, to prevent disruption of JTS's business by various creditors who were attempting to seize its assets.

Relying on Fed.R.Civ.P. 32(a), the defendants object to Prezioso's testimony because they had no notice of and were not represented at Prezioso's deposition. Here, however, Prezioso has also submitted a declaration incorporating his deposition testimony by reference. The substance of his testimony then will be treated as if it was set forth in a declaration. Further, the deposition of Pamela Martinson, a Cooley attorney that worked on the NationsBanc transaction, also provides support for the trustee. Her testimony reflects her knowledge of another case where a lien was used to make it harder for creditors to attach assets and an intent to protect JTS in the same manner. All of this evidence, taken as true, is sufficient to avoid summary judgment in defendant's favor on the fifth claim for relief.

### C. The Sixth Claim for Relief—Lien Subordination.

■ When JTS defaulted on its obligation to repay the NationsBanc loan, NationsBanc began to draw down on the $10 million certificates of deposit that the Amber Group pledged as collateral for the loan. To the extent that the collateral was affected, the Amber Group was subrogated to NationsBanc's senior secured rights under a blanket lien on JTS's assets. As a result, the Amber Group asserts a lien against JTS's bankruptcy estate in an amount slightly over $4 million. In her sixth claim, the trustee alleges that the $4 million lien should be subordinated to the claims of unsecured creditors in compliance with § 510 of the Bankruptcy Code.

Both sides seek summary judgment on this claim. The trustee argues that the undisputed facts establish that subordination is mandatory under § 510(b). The defendants counter that § 510(b) is not applicable to their claim and that the trustee has no evidence that the Amber Group engaged in the type of inequitable conduct required to subordinate a lien under § 510(c).

## 1. *Mandatory Subordination*

Section 510(b) of the Bankruptcy Code specifies the distribution treatment to be accorded to claims for rescission of or damages arising from the purchase or sale of securities of a debtor. It provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). The question here is whether this section affects the Amber Group's $4 million claim secured by its lien against JTS's assets. The trustee argues that it does because the Amber Group's claim "arises from" the purchase or sale of a security, JTS's Series E stock.

The exact meaning of the phrase "arising from" in § 510(b) is unclear. More recent decisions, however, are adamant that the statute's scope should be interpreted broadly to give effect to the remedial goals of the statute. *See In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir.2002); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir.2001); *In re International Wireless Communications Holdings, Inc.*, 257 B.R. 739, 746 (Bankr.D.Del.2001); *In re Kaiser Group Int'l, Inc.*, 260 B.R. 684 (Bankr.D.Del.2001). Based on this more expansive construction, courts have extended § 510(b)'s reach to include breach of contract claims and claims based on wrongful conduct that occurs after the securities sales transaction is completed. *Betacom*, 240 F.3d at 829 (breach of contract claim seeking damages for failure to convey the debtor's stock as required under merger agreement); *In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002)(claim for damages based on post-investment misrepresentations that allegedly caused the investor to hold on to the debtor's stock rather than sell it). The case law, however, does not clearly define the outer reaches of mandatory subordination. Instead, the courts assess whether the policies and goals underlying the statute support subordination in the given circumstances before them.

Although concern with securities fraud claims prodded Congress into action, the ultimate goal of § 510(b) is more wide-ranging. If an equity investor is allowed to re-characterize investment losses, the investor could effectively circumvent the absolute priority rule's risk allocation provisions that require a debtor to pay creditors ahead of equity. Congress designed § 510(b) to maintain the expectations of and risk allocations between these parties by placing securities claims below or on par with the security on which the claim is based. With this purpose in mind, certain factors take on special importance in determining whether the necessary nexus exists between the claim at issue and the purchase or sale of a security. For example, the parties' expectations at the time of the original transaction are significant. If the claimant's expectations were those of an investor rather than a creditor then subordination is more likely to serve the goal of the statute. Another factor is whether the claim attempts to recoup lost investment value.

I conclude that the evidence of record is insufficient to determine whether the Amber Group's claim arises from the purchase or sale of the Series E stock. Contrary to the trustee's argument, the ninth circuit's decision in *Betacom* does not compel sub-

ordination under the facts presented. Although *Betacom* indicates that promissory note claims can be subject to mandatory subordination under appropriate circumstances, it does not describe what type of circumstances justify subordination. Here, the evidence explaining the original transaction does not clearly demonstrate whether the parties intended this transaction to be a debt servicing arrangement or an arrangement to provide the Amber Group with additional investment opportunities. Without additional facts, it is unclear that, as a matter of law, the trustee is entitled to mandatory subordination.

I am also not convinced by the defendants' assertion that their claim is no more than an attempt to collect on a secured debt and has nothing to do with their rights with respect to the Series E stock. JTS agreed to give the Amber Group the Series E stock as consideration for the Amber Group's agreement to guarantee JTS's debt to NationsBanc. Construed in the trustee's favor, this fact suggests that a lien against JTS's assets was not enough to convince the Amber Group to provide collateral for the NationsBanc loan. Rather, the group bargained for the opportunity to retain, or even improve, its equity status, including the ability to enjoy the upside of that ownership interest if the company recovered. After JTS defaulted on its note with NationsBanc, the Amber Group paid more than it anticipated for the Series E stock. When viewed in this light, it appears that the Amber Group's assertion of its lien rights seeks to retrieve an investment loss and should be subordinated under § 510(b). The Amber Group defendants also are not entitled to summary judgment to the extent that the sixth claim for relief is based on § 510(b).

## 2. *Equitable Subordination*

 The doctrine of equitable subordination began as a judicially-created means to prevent misconduct by fiduciaries of a bankrupt. *See Pepper v. Litton,* 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939). It has since been codified in § 510(c) of the Bankruptcy Code, which provides that the court may,

> under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

11 U.S.C. § 510(c)(1). Although this provision allows bankruptcy judges to subordinate claims, it provides no guidance as to when or how to exercise that power. The courts have turned to common law for direction. In *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977), the fifth circuit attempted to distill the available case law and proposed three criteria to be satisfied before equitable subordination is appropriate: 1) the claimant must have engaged in some type of inequitable conduct; 2) the misconduct must have resulted in injury to creditors or conferred an unfair advantage to the claimant; and, 3) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. Moreover, when the claimant is an insider, the burden falls on the insider to prove the inherent fairness of the transaction, but the party seeking subordination must first proffer some substantial factual basis to support its allegation of impropriety. *Id.* at 701.

The Amber Group defendants argue that summary judgment is appropriate because the trustee has no admissible evidence of inequitable conduct. They assert that the trustee relies solely on her mandatory subordination claim. However, the defendants mischaracterize the trustee's response, which clearly raises questions as to whether members of the Amber

Group used insider positions to arrange for NationsBanc's blanket lien against JTS's assets and for the Amber Group's subrogation rights to that lien at a time when NationsBanc did not require any lien at all. If the trustee's evidence is believed, it would support a finding that the defendants misused their positions to the disadvantage of other creditors, which is just the type of misconduct that the doctrine of equitable subordination is meant to correct. The defendants are not entitled to summary judgment with respect to the equitable subordination claim.

## IV. Questions of Fact Preclude Summary Judgment on the Debt Forgiveness Claims.

In January 1996, Mitchell purchased 3 million restricted shares of JTS common stock with cash and a $1.4 million note payable to JTS. Tandon also purchased 1 million restricted shares with no cash down and a $1 million note payable to JTS. Neither Mitchell nor Tandon ever repaid these debts. Then, at a July 17, 1997 meeting of the JTS board, the board discussed, and perhaps authorized, the forgiveness of this debt. Ultimately, the defendants contend, the debt was forgiven in return for Mitchell and Tandon remaining with the company through June 1998.

### A. The Eighth, Eleventh and Twelfth Claims for Relief—Breach of Fiduciary Duty, Constructive Fraudulent Conveyance and Preferential Transfer.

In the eighth claim for relief, the trustee alleges that Mitchell and Tandon breached fiduciary duties owed to JTS creditors by using their positions of trust to avoid their debts to the corporation. Both sides seek summary judgment as to this claim.

The trustee is not entitled to judgment if the defendants can satisfy their burden of establishing the entire fairness of the transaction. At this juncture, however, the defendants need only provide evidence demonstrating that there is a genuine issue of fact regarding the transaction's fairness to JTS. The defendants assert that the transaction was fair because the debts were forgiven in exchange for Mitchell and Tandon's agreement to remain with the company through 1998. They point to a board resolution to this effect, to Tandon's declaration and to the recollection of other JTS directors. Taken as true, the evidence of services in exchange for the debt forgiveness is sufficient to defeat the trustee's request for summary judgment on the eighth claim for relief.

With respect to the defendants' motions, board ratification of the debt forgiveness would not shift the burden to the trustee to establish the unfairness of this transaction because the trustee is representing creditor interests. Even if it did, however, there is no evidence that the required ratification occurred. Under § 144(a)(1), ratification requires the affirmative vote of a majority of the disinterested directors. At the time of the debt forgiveness, JTS had six directors, two of whom were interested in the transaction. Because there were four disinterested directors, the debt forgiveness transaction had to be ratified by the affirmative vote of three of those four. Only two disinterested directors, Tramiel and Johnson, were present at the time the debt forgiveness was allegedly authorized. I am not persuaded by defendants' argument that a majority of the disinterested directors of the quorum present is sufficient for purposes of § 144(a)(1). Applying the plain meaning of the statute, ratification is impossible if less than a majority of the disinterested directors is present at the time of the vote.

Even in the absence of ratification, the defendants urge that the debt forgiveness transaction was entirely fair because the

undisputed facts show that the loan forgiveness was intended solely as an incentive to retain Mitchell and Tandon's services at a time when their services were critical to the company's survival. They argue that Mitchell's and Tandon's continued service served as fair consideration. In support of their position, Mitchell and Tandon point to the minutes from the July 17, 1997 board of directors meeting that reflects a very specific resolution forgiving the notes, but also conditioning cancellation of the notes on Mitchell and Tandon remaining actively involved with the company through June 30, 1998. Defendants also rely on deposition testimony that indicates that the disinterested directors believed it was very important for Mitchell and Tandon to continue to operate the company.

The trustee counters with evidence that raises doubts as to what occurred at the July 17, 1997 board meeting. For example, she points to deposition testimony of both Mitchell and Tandon that reflects their understanding that the debt forgiveness occurred immediately upon the board's July 17, 1997 authorization. The testimony of other directors present at the meeting suggests that they understood that the loans would be forgiven if Mitchell and Tandon returned their shares to the company and that the lawyers would work out the details. Yet, Matthew Sonsini, one of JTS's attorneys, testified that Cooley Godward worked for several months following July 17 to determine the best mechanism for relieving Mitchell and Tandon of their obligations to JTS. The lawyers considered and discarded a number of options, including a repurchase of the shares obtained via the loan or a rescission of the original loan transaction. Finally, the trustee has pointed to evidence suggesting that the July 17, 1997 minutes may not have been prepared until October 1998, more that a year after the debt forgiveness was allegedly authorized.

Construing the trustee's evidence in the light most favorable to her, I conclude that a question of fact remains as to whether the board properly authorized the debt forgiveness and, even if it did, whether it received fair consideration in exchange. Without weighing the evidence, I cannot determine whether the debt forgiveness was authorized in exchange for the continued services of Mitchell and Tandon or whether that explanation is simply an attempt to justify the transaction with the benefit of hindsight. Because proof of fair consideration is essential to the defendants' burden, they are not entitled to summary judgment on this claim.

■ Mitchell and Tandon urge that their agreement to stay with JTS in return for the debt forgiveness also entitles them to summary judgment on the trustee's eleventh claim based on constructive fraudulent conveyance. Again, they argue that JTS received reasonably equivalent value in exchange for the debt forgiveness. Because this argument is based on the same evidence offered in support of their motion on the eighth claim, summary judgment also is denied as to the eleventh claim.

■ Only Mitchell has moved for summary judgment with respect to the twelfth claim, which alleges that the debt forgiveness was a preferential transfer of JTS's interest in the accounts receivable represented by the loans. As with the eighth and eleventh claims, Mitchell asserts that the preference claim fails as a matter of law because JTS received adequate consideration for the debt forgiveness. Again, summary judgment is inappropriate.

B. *The Ninth and Tenth Claims for Relief—Illegal Purchase of Shares and Liability for Unpaid Stock.*

■ To the extent that the forgiveness of Mitchell and Tandon's debt constitutes a

purchase of JTS shares by the corporation, the trustee alleges that the purchase was in violation of 8 Del. C. § 160. Section 160(a)(1) provides that a corporation may not purchase its own shares of capital stock when the capital of the corporation is impaired or would be impaired by the purchase. The director defendants may be required to return any consideration paid for such a purchase pursuant to 8 Del. C. § 174. Additionally, where a stockholder has not paid for stock in full and the assets of the corporation are insufficient to satisfy the claims of the corporation's creditors, 8 Del. C. § 162 provides that the stockholder shall be bound to pay the unpaid balance of the consideration owed.

■ The directors urge that they are entitled to summary judgment on both of these statutory claims because the trustee concedes that the debt owing on those shares was simply forgiven. If it was forgiven, the directors argue, the shares were not repurchased and no amount remains due on the notes. This argument is not compelling because the trustee is allowed to plead and pursue alternative, inconsistent theories. *Margarita Cellars v. Pacific Coast Packaging, Inc.*, 189 F.R.D. 575, 578–79 (N.D.Cal.1999). While it may be inappropriate for a plaintiff affirmatively to seek summary judgment on inconsistent theories, *see Farris v. Century Planners, Ltd.*, 858 F.Supp. 150, 154 (D.Kan.1994), the trustee's motions are not incongruous. She concedes that if she her motion on the eighth claim had succeeded, she would not also be entitled to judgment on these conflicting statutory claims. Until it is judicially determined that the debt was forgiven and that the board of directors properly authorized the forgiveness, there is no sound basis for precluding the trustee from pursuing the ninth and tenth claims for relief.

## V. *Summary Judgment is Appropriate With Respect to Claims Related to the Atari Bridge Loans.*

■ In late 1997, JTS decided to sell certain intellectual property rights that it had obtained in its 1996 merger with Atari. However, JTS needed interim financing to maintain its operations while it negotiated the sale. The Amber Group, including Amber Arbitrage, Mitchell, Tandon and Tramiel, agreed to loan funds totaling $3 million secured by the Atari intellectual property. In February 1998, JTS sold the intellectual property to Hasbro for $5 million, repaying the $3 million it had borrowed, along with accumulated interest at an annual rate of 8.5 percent as set forth in the promissory notes documenting the loans.

In her seventh claim for relief, the trustee asserts that repayment of the $3 million dollars while JTS was insolvent breached fiduciary duties that Amber, Mitchell, Tandon and Tramiel owed to JTS's creditors. The trustee relies solely on her strict interpretation of the trust fund doctrine, while defendants Mitchell, Tandon and Tramiel seek judgment in their favor because the transaction was entirely fair.

Even upon insolvency, Delaware law has not strictly held that all payments to directors ahead of other creditors constitute a breach of the directors' fiduciary duties. Although the court in *Broad Street Theatre* concluded that principles of "applied common honesty" prohibited the director there from paying himself before other creditors, nowhere did the court suggest that the result would be the same under all circumstances. *Broad Street Theatre*, 174 A. at 116. Similarly, in *Holloway*, the court held that payments to an interested director were void, but it stated that when such transactions are challenged, the director who has profited bears the burden

of proving that transactions with the corporation are fair. *Holloway*, 1977 WL 2573 at *3. Even in *Bovay*, the Delaware supreme court's decision was premised upon a finding that the interested directors personally profited at significant cost to the corporation. *Bovay*, 38 A.2d at 820.

In light of these principles, it is clear to this court that the Atari bridge loans do not constitute a breach of fiduciary duty to creditors of JTS. Instead, the undisputed facts reveal a unique set of circumstances where corporate insiders provided interim financing, enabling the company to negotiate a sale and resulting in $2 million of additional funds after payment of the interim loans. The loans to the corporation and the corporation's agreement to repay the insiders was integral to a much larger transaction that resulted in a net benefit to the company. Under these facts, repayment of the loans appears to be entirely fair to the insolvent corporation and its creditors. The defendants are entitled to summary judgment in their favor on the trustee's seventh claim for relief, and the trustee's cross-motion is denied.

### VI. *The Evidence is Insufficient to Grant Summary Judgment in Defendant's Favor as to the Windbond Bridge Loan Claim.*

According to the deposition testimony of Adron Beene, Tramiel's attorney, Tramiel gave Beene $59,103 on October 27, 1997 for deposit into a JTS trust account. Shortly thereafter, a check was written on the trust account in the same amount for settlement of a lawsuit against JTS. On November 7, 1997, JTS received $275,000 in settlement of its claims against another company. Beene deposited these funds in the trust account, and, on November 20, 1997 paid Tramiel $59,312. Beene explained that Tramiel paid the $59,103 into the trust account because "probably JTS didn't have the 59K. Jack fronted it for them knowing that Tradewell was going to pay, and then Jack would get repaid. It was a bridge loan."

As with the Atari bridge loans, the trustee argues that the trust fund doctrine strictly prohibits Tramiel from receiving repayment of this bridge loan in front of other creditors. The appropriate standard, however, is whether the repayment was entirely fair to JTS in light of the particular facts of the transaction. Because it is Tramiel's burden to affirmatively establish the entire fairness of the repayment, he is not entitled to summary judgment absent evidence satisfying his burden.

Although Tramiel offered Beene's deposition testimony describing the transaction, a close reading of that testimony reveals that Beene merely speculated about what "probably" occurred. Further, Tramiel has provided few details regarding the terms of the purported bridge loan, and those that are provided raise more questions. For example, Tramiel's fairness argument rests on the fact that JTS received a seventeen day, *interest free*, bridge loan. Yet, Beene testified that Tramiel received $209 more than he originally loaned to JTS. While this discrepancy may not involve a large monetary amount, it underscores the need for further evidence concerning the specifics of the transaction.

Tramiel's reliance on *Odyssey Partners*, does not change the outcome. *Odyssey Partners* recognizes that a director who has loaned money to his corporation is not required to forego his right as a creditor in the sense that the director has a right to maintain a claim against the corporation, just like any other creditor. *Odyssey Partners*, 735 A.2d at 415 (Del.Ch.1999). Nowhere, however, did the court suggest that a director's rights include a right to be paid ahead of other creditors especially

when the payment is not entirely fair to the corporation. Because a question of fact remains regarding the entire fairness of this transaction, the court is unable to grant summary judgment in favor of defendant Tramiel.

## VII. *The Evidence Only Supports Partial Summary Judgment Regarding the Fifteenth and Sixteenth Claims for Relief Against the Attorney Defendants.*

From January 1996 to April 1998, Cooley Godward represented JTS. During that time, Manoliu, Sonsini and Pope performed legal work for JTS in connection with the business transactions at issue. The trustee alleges that, through their work, the attorney defendants participated in and facilitated the alleged misconduct, breached fiduciary duties owed to JTS and its creditors, and committed legal malpractice.

### A. *The Sale of Real Property Transaction.*

Tramiel initially discussed his purchase of the eight parcels with Virginia Walker, JTS's chief financial officer. After they had worked out the basic terms of Tramiel's purchase, Walker contacted defendant Pope, a partner in Cooley Godward's real estate practice group, to finalize the transaction and draft a sales contract reflecting the terms of the deal. Pope's initial conversation with Walker occurred on August 9, 1996. During this conversation, Walker advised Pope that an appraisal of the eight properties indicated that their combined market value was $15 to $16 million. Over the next month, Pope worked with Tramiel's lawyer, Adron Beene, to draft the contract and to negotiate the remaining details of the sale. The transaction closed on September 10, 1996. Pope had no further involvement with JTS or the real properties after the agreement was executed.

The trustee asserts that Pope breached fiduciary duties owed to JTS and engaged in legal malpractice because she failed to advise the board of directors that the property was being sold for less than fair market value, a fact that could have adverse legal consequences for the company. Additionally, the trustee contends that Pope should have counseled the board to structure the transaction as a secured loan rather than a sale with a repurchase option. Pope seeks summary judgment in her favor on all claims against her.

Whether the trustee's claim is framed as a claim for breach of fiduciary duty or for legal malpractice, the essential elements are virtually identical. Each requires proof of a duty, a breach of that duty and damage proximately caused by the breach. *See Stanley v. Richmond,* 35 Cal.App.4th 1070, 1086, 41 Cal.Rptr.2d 768 (1995) (breach of fiduciary duty); *Garretson v. Miller,* 99 Cal.App.4th 563, 568, 121 Cal. Rptr.2d 317 (2002)(legal malpractice). Pope asserts that she had no duty to provide business advice to JTS, but, if she did, she satisfied her duty. Pope further asserts that JTS received fair value for the real properties and, therefore, suffered no damage.

As the defendants point out, the scope of an attorney's duty will turn on the parameters of the agreed representation. *Piscitelli v. Friedenberg,* 87 Cal.App.4th 953, 983, 105 Cal.Rptr.2d 88 (2001). Nevertheless, an attorney may still have a duty to alert clients to legal problems that are reasonably apparent, even when they fall outside the scope of the retention. *Nichols v. Keller,* 15 Cal.App.4th 1672, 1684, 19 Cal.Rptr.2d 601 (1993). This makes sense because a skilled attorney is substantially more qualified to recognize potential legal problems than the typical

client would be. For that reason, in *Nichols*, the court concluded that attorneys should be prepared to volunteer legal opinions when necessary to further a client's objectives and should provide advice regarding alternatives where the failure to consider them could result in adverse consequences. *Id.*

Here, Pope urges that JTS retained her solely to draft the sales agreement for the sale of the real properties to Tramiel and that no one has suggested that she made any error in reducing the transaction to writing. But, the scope of Pope's duty to JTS is not so narrow. JTS hired Pope to be its legal representative in the real properties transaction. Although many of the terms had been negotiated at the time she was retained, Pope still settled several details of the agreement on JTS's behalf. These facts indicate that her role was greater than that of mere scrivener. The undisputed facts also establish that Pope was aware from the beginning that JTS, a struggling company, was about to sell its eight parcels of property for approximately $5–6 million less than their appraised value. Even if she had not been retained specifically to investigate the fair market value of the properties, the potential harm to JTS from such a deal should have been reasonably apparent. While Pope may have believed it was outside the scope of her representation to solve the problem, that does not relieve her of the duty to inform her client of the possible need for further legal advice. Indeed, even Pope has conceded that lawyers must advise their clients "on matters that they were hired to provide advice about, as well as any other legal issues outside their representation, 'which are reasonably apparent.' "

I am also not persuaded by Pope's argument that she did not breach any duty because she knew that JTS already knew the value of the property. Pope contends that she had no obligation to disclose the appraised value of the properties because Pope learned that information from JTS's chief financial officer. But, Pope's duty was not to simply advise JTS of the properties' value. Her obligation was to advise that, in light of that value, the transaction could have adverse legal consequences for JTS. Construed in the trustee's favor, it is reasonable to conclude from the evidence that JTS would have acted differently if it had been cautioned that a sale at less than fair market value might breach duties JTS owed to its creditors. If proven at trial, then, the failure to provide such advice would constitute a reasonable basis for concluding that the attorney defendants' conduct proximately caused the alleged damage. *Viner v. Sweet,* 30 Cal.4th 1232, 1242–43, 135 Cal.Rptr.2d 629, 70 P.3d 1046 (2003).

Pope's final assertion, that JTS suffered no damage as a result of the real estate transaction is equally unconvincing because questions of fact preclude any determination, as a matter of law, that JTS received fair value. Until this determination is made, it cannot be said that JTS suffered no damage. As a result, neither Pope nor the other attorney defendants involved in the real estate transaction are entitled to summary judgment with respect to the fifteenth and sixteenth claims for relief.

### B. *The NationsBanc—Series D/E Stock Exchange Transaction.*

The attorney defendants seek summary judgment on each claim that arises out of the NationsBanc transaction because the transaction did not damage either JTS or its creditors. They insist that the security interest in JTS's assets was necessary because Amber insisted on security for the Amber Group in the event

that the certificates of deposit were drawn down to make payments on the Nations-Banc line of credit. Even if NationsBanc did not request the lien, a fact which the defendants dispute, they contend that Amber's insistence made the lien an integral piece of the three way transaction.

The attorney defendants' argument is premised on one version of the facts. However, there is also evidence that reasonably suggests that the blanket lien was employed as a means to make it more difficult for other creditors to recover money from JTS. For example, the deposition of Pamela Martinson, a Cooley attorney that worked on the NationsBanc transaction, indicates that she was aware of another case where a lien was used to make it harder for creditors to attach assets. Her notes reflect an intent to protect JTS in the same manner. Prezioso's deposition further suggests that the purpose of the lien was to thwart various creditors who were attempting to seize JTS's assets. In the end, a question of fact remains as to whether the lien was integral to the NationsBanc transaction, as defendants argue, or whether the lien was added to the transaction as an obstacle for JTS's other creditors.

■ I am also not convinced by the attorney defendants' argument that the trustee has no standing to bring her NationsBanc related claims because trustees may only sue for actions that injure creditors if the conduct first harmed the debtor corporation. They assert that JTS was not injured because the security interest did not hinder JTS's operations or decrease its assets. This argument is unavailing. Injury for standing purposes can result from the erroneous imposition of a lien because the attachment in and of itself can have adverse consequences for the owner. *Demille v. Belshe*, 1994 WL 519457 (N.D.Cal. Sept.16, 1994).

■ Although the questions of fact surrounding the blanket lien are sufficient to preclude summary judgment, certain other defense arguments merit brief comment. The attorney defendants assert that they cannot be held liable for assisting in the exchange of Series E stock for the Series D stock because the trustee cannot establish damages. They correctly point out that the shares transferred only represent units of ownership interest with no extrinsic value to the corporation. *In re Curry and Sorensen, Inc.*, 57 B.R. 824, 829 (9th Cir. BAP 1986). The trustee's attempt to circumvent the damage requirement because the Series E stock unjustly enriched the Amber Group is not persuasive. The cases permitting unjust enrichment to substitute for damages in breach of fiduciary claims are based on the policy decision that extinguishing the ability to profit personally from breaches of fiduciary relationships will remove the temptation to engage in such breaches. *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). This policy is not served unless the fiduciary is unjustly enriched by his own conduct. In the fifteenth claim for relief, the attorney defendants are the fiduciaries, not the Amber Group. Because the trustee has not provided evidence that the attorney defendants profited from the exchange of the Series D and Series E stock, unjust enrichment cannot satisfy the damage element of the breach of fiduciary duty or legal malpractice claims.

### C. *The Debt Forgiveness Transaction.*

■ The evidence surrounding JTS's purported decision to forgive $3 million of debt owed by Mitchell and Tandon is confused and conflicting. As a result, the trustee has found it necessary to plead several alternative theories of recovery against the director defendants, none of which is ripe for summary judgment. Al-

though the attorney defendants contend that they did not breach any duties owed to JTS or commit malpractice with respect to the debt forgiveness transaction, that contention is based on one version of the facts. As discussed earlier, the court will need to weigh the evidence and the credibility of the witnesses to determine whether the debt was forgiven, whether the board properly authorized the forgiveness and whether JTS received fair consideration for any alleged forgiveness. Until these basic facts related to the transaction are developed, it is impossible to determine whether the attorney defendants have breached any duties owed to JTS related to the transaction. As a consequence, summary judgment is not warranted based on the absence of breach of duty.

Additionally, the attorney defendants maintain that the debt forgiveness transaction was entirely fair and did not damage JTS or its creditors. This argument fails in light of the previously identified questions of fact related to the transaction's fairness and whether JTS received fair value in exchange for the forgiveness. On the record before the court, it is unclear whether the forgiveness was consideration for the continued services of Mitchell and Tandon, or whether that explanation is an after-the-fact justification for a transaction that otherwise damaged JTS. The attorney defendants are not entitled to summary judgment on any claims against them related to the debt forgiveness transaction.

### D. *Atari Bridge Loans Transaction.*

In light of my earlier conclusion that the Atari bridge loans were entirely fair, the attorney defendants did not breach any duty owed to JTS related to that transaction. Partial summary judgment is appropriate to the extent that the fifteenth and sixteenth claims against the attorney defendant are based on the Atari bridge loan.

### E. *Series B/C Stock Exchange Transaction.*

■ The trustee alleges that the attorney defendants committed legal malpractice related to a sixth business transaction that is not elsewhere at issue in this litigation. Shortly after the Atari merger, JTS conducted two private placements of convertible preferred stock. First, in October 1996, it sold 15,000 share of Series B Convertible Preferred Stock for $1,000 per share for a total of $15 million. A few months later, in January 1997, it sold 25,000 shares of Series C Convertible Preferred Stock for a total of $25 million.

Both the Series B and Series C shares were convertible into JTS common stock at a rate equal to the lower of either $3.6125 per share or a floating conversion price equal to 85% of the average lowest trading price over the five day period immediately preceding the conversion. This means of raising capital is known as the placement of floorless convertible securities because the holder of the security is protected against declining stock prices by the 85% of market price option and there is no maximum number of shares that can be received as the issuer's market price decreases. Because the floorless nature of this financing creates significant risk for struggling companies, it is sometimes called "toxic convertible" or "death spiral convertible" financing. Throughout 1997 and 1998, JTS's stock price declined and the holders of the Series B and C stock began converting their shares. Eventually, JTS issued over 64 million shares of common stock to the Series B and C stockholders. The trustee's malpractice claim is premised on the attorneys' failure to appreciate and advise the JTS board about

risks associated with the placement of the Series B and C convertible stock.

The defendants point to deposition testimony indicating that Lip–Bu Tan and Jean Deleage, both members of JTS's board, understood that the financing was "risky" and "presented a certain danger." Deleage further stated that Cooley described the mechanics of the financing to the board. Based on this testimony, they argue that the undisputed facts show that they adequately advised JTS about the potential dangers of the financing arrangement and that the directors decided to proceed despite their appreciation of the risks. To the contrary, evidence that Cooley described "mechanics" does little to establish that the attorney defendants adequately advised the directors of the risk associated with floorless convertible financing. Nevertheless, the key question on this motion is whether the trustee has any evidence that the attorney defendants did not provide adequate advice. In this regard, Tan testified that no one from Cooley ever advised him that the issuance of Series B or C shares might affect the trading price of JTS common stock. Further, Mitchell testified that at the time of the transactions, he had no understanding of the term "floorless" or its significance with respect to the decision to issue the Series B or C stock. Finally, Tandon stated that he does not recall any attorney explaining the nature of the transactions or advising the board of the financial risks involved. One reasonable inference from the trustee's evidence is that the defendants failed to provide an appreciation of the dangers of the floorless convertible financing or its potential impact on the company. Because the attorney defendants had a duty to explain those risks, a question of fact remains as to whether the attorney defendants breached that duty.

There is also some evidence that the investors in the B and C Series stock may have agreed to a lock-up period that would have prevented them from selling their stock as they did in 1997 and 1998. However, this provision was not included in the written documents. It is reasonable to expect that an attorney retained to review documentation of the transaction would insure that significant terms, like a lock-up provision, were part of the written agreement. Even if it was not within the scope of their duty to correct the omission, there is a question of fact as to whether the applicable standard of care required the attorney defendants to alert JTS that a seemingly important provision was omitted and could have adverse consequences for the company.

 The last question is whether any alleged breach of duty proximately caused damage to JTS. To succeed on her malpractice claim, the trustee must demonstrate that but for the alleged malpractice, it is more likely than not that JTS would have obtained a more favorable result. *Viner*, 30 Cal.4th at 1242, 135 Cal.Rptr.2d 629, 70 P.3d 1046. While it is not necessary to prove causation with absolute certainty, there must be evidence, circumstantial or otherwise, which forms a reasonable basis for concluding that the defendant's conduct was a cause in fact of the result. *Id.* at 1243, 135 Cal.Rptr.2d 629, 70 P.3d 1046, *quoting, Ortega v. Kmart Corp.*, 26 Cal.4th 1200, 1205, 114 Cal.Rptr.2d 470, 36 P.3d 11 (2001).

The attorney defendants urge that the sale itself caused no damage because it improved JTS's financial condition by raising $40 million in new funds. They further maintain that the trustee cannot prove that the conversion of the Series B and C shares, rather than general market forces, drove down the price of JTS's stock. Even if it did decline, they argue,

JTS's stock has no extrinsic value to the corporation and, therefore, any decline in value could not damage JTS or its creditors. The trustee responds with deposition testimony of Roger Johnson, a JTS director, indicating that the Series B and C investors almost immediately began "short selling" their Series B and C shares in breach of an agreement not to do so. Johnson further testified that the sales led to a "terrible cascading" in value of the stock. Further, the trustee's expert has expressed the opinion that the dilution of JTS shares and the resulting decline in value impaired JTS's ability to raise capital from other sources.

The trustee's evidence is sufficient to raise a question of fact on the issues of causation and damage. As a result, summary judgment is denied to the extent that the sixteenth claim for relief is based on the Series B and Series C stock transactions.

## VIII. Questions of Fact Generally Preclude Summary Judgment on the Derivative and Other Miscellaneous Claims.

### A. Summary Judgment on the Derivative Claims is Only Appropriate to the Extent that the Claims Are Based on the Atari Loans Transaction.

In her eighteenth through twenty-first claims, the trustee seeks to hold the directors who were not personally involved in a particular transaction responsible for the alleged breaches of fiduciary duty committed by the interested directors. Each claim asserts an independent basis for imposing liability on the directors not actively involved in the specific transactions. The eighteenth claim asserts that the non-interested directors independently breached fiduciary duties owed to JTS's creditor body when they approved the transactions, either knowing those transactions violated the interested director's duty of loyalty or without conducting sufficient investigation to properly inform themselves of the breach. This claim, however, does not include liability based on the failure to exercise due care. The nineteenth claim asserts that the non-interested directors aided and abetted the various breaches of fiduciary duty and the twentieth claim urges that the other directors conspired with the interested directors to breach their duties with respect to each transaction. The twenty-first claim alleges that the conduct at issue constitutes unfair business practices in violation of California statutory law. Similarly, in her seventeenth, twentieth and twenty-first claims, the trustee alleges that the attorney defendants are responsible for the directors' breaches of fiduciary duty under theories of aiding and abetting, conspiracy and unfair business practices.

All defendants seek summary judgment on these counts because the underlying transactions were fair and did not damage JTS. However, the court was only able to conclude that the Atari bridge loans transaction was entirely fair to JTS and its creditors. Further, questions of fact regarding damage must be resolved at trial. Partial summary judgment is granted in favor of the defendants only to the extent that the seventeenth through twenty-first claims for relief are based on the Atari bridge loans. In all other respects, the derivative claims stand.

Mitchell's further argument that the trustee has failed to establish any aiding and abetting or conspiracy claim against him is unavailing. The elements of an aiding and abetting claim include 1) the existence of a fiduciary relationship, 2) breach of the fiduciary's duty, and 3) knowing participation in that breach. *In re Healthco*, 208 B.R. 288, 309 (Bankr.

D.Mass.1997). However, proof that the defendant fiduciary was advised that the transaction would breach the fiduciary's duty is not required. *Id.* Although Mitchell asserts that the third element is unsatisfied because there is no evidence that he believed his conduct constituted a tort or was otherwise unlawful, there is evidence that Mitchell knew all the essential details of the transactions, and as a board member, he acted to approve and facilitate the transactions. That conduct is sufficient to establish a question of fact as to his knowing participation.

Mitchell likewise argues, with respect to the conspiracy claim, that there is no evidence that he knew or intended to participate in any wrongful conduct. Although knowledge of the conspiracy's wrongful objective is a key element of a conspiracy claim, knowledge and intent may be inferred from the nature of the acts, the relation of the parties and other circumstances. *Kidron v. Movie Acquisition Corp.*, 40 Cal.App.4th 1571, 1583, 47 Cal. Rptr.2d 752 (1995). Again, knowledge of the essential details of the transactions coupled with Mitchell's knowledge that he was a fiduciary is sufficient to raise a question of fact as to Mitchell's awareness of a wrongful objective. To the extent that the derivative claims are not based on the Atari bridge loan transaction, they must be resolved at trial.

B. *Summary Judgment is Appropriate With Respect to the Alter Ego Claim.*

 The trustee's fourteenth claim for relief seeks to hold Mitchell, Tandon and Tramiel personally liable for all the debts of JTS because the corporation is nothing more than the alter ego of those directors. The parties primarily point to Delaware law with respect to the alter ego question and the court agrees that Delaware law controls this issue. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 267 (D.Del.1989), *citing*, 2 E. Folk, R. Ward & E. Welch, *Folk on the Delaware General Corporation Law* § 329.3 (2d ed.1988) (question whether to disregard the corporate entity is determined under Delaware law when it is a Delaware corporation that would be ignored).

 It is a difficult task to persuade a court to disregard a corporate entity under Delaware law. *LaSalle National Bank v. Perelman*, 82 F.Supp.2d 279, 295 (D.Del.2000). A corporation is presumed to be separate and distinct entity. The trustee must satisfy a two prong test before JTS's corporate form will be disregarded: 1) the corporation and the shareholders must be operating as a single economic entity, and 2) there must be an overall element of injustice or unfairness. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr.D.Del.2003). The courts consider many factors, including commingling of funds, the holding out of one entity as liable for the debts of the other, disregard of corporate formalities and lack of separate corporate records, to determine whether the corporation and the shareholder or shareholders are operating as a single economic unit. *Id.* at 235. These factors do not, however, satisfy the second prong of the alter ego test. *Id.* at 236. Instead, there must be additional proof that some fraud or injustice has resulted from the defendants' misuse of the corporate form. *Id.* at 236.

Under these standards, the trustee's evidence of inadequate capitalization, assumption of debt, asset stripping and improper maintenance of corporate records, even if proven, is not sufficient to pierce the corporate veil. The trustee has offered no evidence that JTS was formed to effectuate any type of fraud or injustice with respect to creditors. To the contrary, the

evidence reveals that JTS had real business objectives. It had an operating board of directors that met regularly, retained its own corporate counsel which regularly advised the corporation concerning the corporation's business affairs and maintained its own bank accounts and corporate records. There is nothing to indicate that there was any attempt to use JTS's corporate form to defraud or otherwise deceive those who did business with the corporation.

Because the trustee has failed to offer evidence raising a genuine question of fact regarding the overall element of fraud or similar injustice, summary judgment is granted with respect to the fourteenth claim for relief.

C. *Mitchell's Request for Summary Judgment With Respect to the Trustee's Request for Punitive Damages Is Denied.*

Defendant Mitchell asserts that the facts warrant summary judgment on the trustee's request for punitive damages against him because there is no clear and convincing proof that he acted with malice. To recover punitive damages, the trustee must prove by clear and convincing evidence that Mitchell is guilty of despicable conduct with a willful and conscious disregard for the rights of others. *Heller v. Pillsbury Madison & Sutro*, 50 Cal. App.4th 1367, 1390, 58 Cal.Rptr.2d 336 (1996). Although the trustee's evidence in this respect is not strong, it indicates that Mitchell affirmatively sought relief from his debt to JTS at a time when the company was having difficulty paying its debts. In light of his fiduciary duties as a director of the company, his actions to further his personal interest are sufficient to raise a question of whether he was acting in conscious disregard for the rights of the company's other constituent groups. In light

of the many factual issues that remain and the evidence that Mitchell disregarded the rights of others, summary judgment is unwarranted.

D. *The Trustee's Counter–Motions for Summary Adjudication of Issues Are Denied.*

In response to the defendants' multiple motions for summary judgment, the trustee asks the court to rule as a matter of law on a variety of specific legal and factual issues. The legal issues have been addressed and need not be considered further. With respect to adjudication of facts, the many factual disputes discussed above also preclude adjudication in favor of the trustee. Moreover, the defendants have not yet had the opportunity to complete expert discovery. As a result, summary adjudication of any issue involving expert testimony is premature.

### CONCLUSION

The poundage of paper filed in support of and in opposition to the motions before the court is a testament to the multitude of disputed facts, evidentiary objections, and conflicting inferences that the parties have culled from the evidence. Under these circumstances, the admonition to use caution in granting summary judgment is particularly relevant. It is entirely appropriate to deny summary judgment where there is reason to believe that the better course is to proceed to full trial. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. While deciding whether to grant summary judgment may have been close in some instances, the significance of the unresolved questions of fact demonstrates that trial is clearly the more expedient course.

For the reasons explained, summary judgment is granted in favor of the director defendants on the trustee's seventh

and fourteenth claims for relief. Further, partial summary judgment is granted in favor of all defendants on the seventeenth through twenty-first claims for relief to the extent that those claims are based on the Atari bridge loans transaction. In all other respects, all motions for summary judgment and for summary adjudication of issues are denied.

Good cause appearing, IT IS SO ORDERED.