# United States Court of Appeals
## For the First Circuit

No. 05-1010

IN RE MERRIMAC PAPER COMPANY, INC.,

Debtor,

_____

MERRIMAC PAPER COMPANY, INC.,

Plaintiff, Appellee,

v.

RALPH HARRISON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]
[Hon. Joel B. Rosenthal, U.S. Bankruptcy Judge]

Before

Selya, Lynch, and Howard,

Circuit Judges.

Thomas P. Smith, with whom Caffrey & Smith, P.C. was on brief, for appellant.
Ellen L. Beard, Senior Appellate Attorney, U.S. Department of Labor, with whom Howard M. Radzely, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, and Elizabeth Hopkins, Counsel, were on brief, for Secretary of Labor, amicus curiae (in support of reversal).
Gary R. Greenberg, Louis J. Scerra, Jr., Annapoorni R. Sankaran, and Greenberg Traurig, LLP on brief for Peter Shapiro and

a Certified Class of Persons and Entities Similarly Situated, amici curiae (in support of reversal).

James F. Wallack, with whom Rafael Klotz and Goulston & Storrs, P.C., were on brief, for appellee.

_____

August 25, 2005

_____

**SELYA**, <u>Circuit Judge</u>. This case raises important questions about the ability of bankruptcy courts to subordinate claims arising from stock redemption installment payments that trace their origin to ERISA-qualified retirement plans. After reviewing recent Supreme Court precedents, we hold, as a general matter, that bankruptcy courts may not use their powers of equitable subordination to downgrade stock redemption claims on a categorical basis; instead, they must evaluate the propriety of equitable subordination case by case. Taking this general approach, we hold, more specifically, that the stock redemption note at issue here — a note delivered in partial liquidation of the retirement benefits of a retiring employee under an employee stock ownership plan — may not be equitably subordinated because the debtor has not made a particularized showing of special circumstances (such as misconduct on the part of the note holder). Consequently, we reverse the contrary rulings of the courts below, vacate the order appealed from, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

The material facts are not in dispute. The debtor, Merrimac Paper Company, Inc., is a Delaware corporation that maintains its principal place of business in Massachusetts. The appellant, Ralph Harrison, worked for the debtor in an executive capacity from 1963 to 1999. When the debtor adopted an employee

stock ownership plan (ESOP) in 1985, the appellant became a participant.

The ESOP was qualified under the Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C. § 1107(d)(6); see also 26 U.S.C. § 4975(e)(7). Pursuant to its terms, the debtor established a trust and proceeded to make variable annual contributions to it (in amounts designated from time to time by its board of directors). The trust invested the funds on behalf of participating employees, primarily in the debtor's stock. The trust maintained an individual account for each participant, specifying his or her share of the investments held in trust. Over time, the ESOP (and through it, the debtor's employees as a class) came to own the majority of the debtor's issued and outstanding common stock.

The ESOP provided that upon a participating employee's separation from service, the vested portion of that employee's individual account would be distributed to him or her in the form of the debtor's stock. Because the stock was not publicly traded, a retiring employee had the option either to retain the stock received or, at any time within fifteen months of the distribution date, to compel the debtor to redeem it at fair market value (a step known as the "put option"). Upon an employee's exercise of the put option, the debtor could elect to pay for the redeemed stock in substantially equal annual payments over a period not to

exceed five years. If the debtor chose to make installment payments, it was required to pay interest on the deferred balance and to furnish adequate security.[1]

At the time of the appellant's retirement in 1999, his ESOP account held approximately 6% of the debtor's common stock. He indicated an intention to exercise the put option. Following an appraisal, the appellant's shares were valued at $1,116,200.

On July 19, 2000, the appellant formally exercised the put option. In simultaneous transactions, he constructively received the shares and sold them back to the debtor, which gave him a promissory note for $916,300 (the Note). This amount equaled the appraised value of the shares less a cash advance paid earlier to the appellant. The Note bore interest at a rate of 8.5% per annum and called for the principal balance to be amortized in three equal annual installments.

The appellant received the first installment payment on January 4, 2001. The debtor thereafter encountered financial difficulties and failed to make the next annual payment. On September 6, 2002, the appellant accelerated the Note and brought suit in a Massachusetts state court for breach of contract based on the failure to pay. A few days later, the appellant attached the

---

[1]The ESOP's stock redemption provisions conformed precisely to the applicable federal statutes and regulations. See 29 U.S.C. § 1107(d)(6)(A); see also 26 U.S.C. §§ 401(a)(23), 409(h); 26 C.F.R. § 54.4975-7(b)(12)(iv).

debtor's real estate (the Attachment) to secure payment of the balance owed on the Note.

The appellant's state court complaint did not mention ERISA. He remedied this omission in January of 2003, when he instituted a second suit in the federal district court. His federal court complaint named the debtor, the ESOP, and the ESOP's trustees as defendants and averred, inter alia, that these defendants had denied him ERISA benefits (specifically, the unpaid balance due on the Note) and, in the bargain, had failed to fulfill their fiduciary duties under ERISA. The debtor countered by removing the state court action to the federal court on the ground that it constituted part and parcel of the same case or controversy as the newly filed federal action. See 28 U.S.C. §§ 1367, 1441.

Two months later, the debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. See 11 U.S.C. §§ 1101-1174. The docketing of the bankruptcy petition automatically stayed the appellant's two pending actions. See id. § 362(a)(1). The appellant filed a timely claim in the bankruptcy proceedings and noted on the claim form that he sought "ERISA benefits." He attached to the claim copies of both the Note and the state court complaint.

On June 20, 2003, the debtor commenced an adversary proceeding against the appellant in an effort to subordinate his claim. See 11 U.S.C. § 510(b), (c)(1). It also sought to have the

Attachment transferred to the bankruptcy estate for the benefit of creditors generally. See id. § 510(c)(2). The debtor's ensuing motion for summary judgment characterized the appellant's claim as a "stock redemption claim" but did specify that it had its genesis in an ESOP retirement distribution. While its summary judgment motion was pending, the debtor filed its proposed plan of reorganization. That plan contemplated that the claims of general unsecured creditors would have priority over stock redemption claims (whether secured or unsecured), regardless of their origin. As the debtor could only pay a fraction of the value of the general unsecured claims, this meant that the Note would be extinguished and the appellant would receive nothing on it.

The appellant opposed both the summary judgment motion and the reorganization plan, arguing among other things that payment of ERISA-protected employee benefits pursuant to an ESOP is qualitatively different than a garden-variety stock redemption and that, even if the court treated his claim as a stock redemption claim notwithstanding its ERISA-connected roots, equitable subordination was not available in the absence of any inequitable conduct on his part. The appellant also launched a counteroffensive; he asked the district court to withdraw the adversary proceeding, challenging the bankruptcy court's jurisdiction on the ground that the adversary proceeding required the resolution of ERISA issues. See 28 U.S.C. § 157(d) (stating

-7-

that a district court shall withdraw such a proceeding if it requires consideration of both bankruptcy law and other federal law). Concomitantly, the appellant asked the bankruptcy court to lift the automatic stay insofar as it pertained to his pending actions.

This counteroffensive bore no fruit. The district court denied the motion to withdraw the adversary proceeding on July 8, 2003, holding that the proceeding did not involve a substantial question of ERISA law. The bankruptcy court denied without prejudice the appellant's motion to lift the automatic stay. The court explained that, in its view, "many if not all of the issues" presented in the original litigation would be rendered moot by its resolution of the matters pending in the bankruptcy court.

On November 7, 2003, the bankruptcy court granted the debtor's summary judgment motion and subordinated the appellant's claim. In re Merrimac Paper Co., 303 B.R. 710, 722-23 (Bankr. D. Mass. 2003) (Merrimac I). The court considered the appellant to have made two claims, namely, a straightforward claim for payment of the Note and an ERISA claim unrelated to the Note. See id. at 718. With respect to the latter claim, the court remarked that it had looked to the complaint in the original federal court action and considered the claim to be for "damages that arise from [the appellant's] sale of stock to Merrimac." Id. at 719.

In evaluating these claims, the bankruptcy court first considered section 510(b) of the Bankruptcy Code, which requires subordination of any and all claims arising from "rescission of a purchase or sale of a security of the debtor."  The court found that the claim under the Note arose from the enforcement of a debt, not the sale of a security.  Id. at 718-19.  Accordingly, the claim could not be subordinated under section 510(b).  Id. at 719. Conversely, the court characterized what it described as the "unrelated" ERISA claim as one arising out of the sale of stock and, thus, found it to be within the purview of section 510(b). Id. at 719-20.  Consequently, that claim was subordinated.  Id. at 720.

The court then turned to the question of equitable subordination.  See 11 U.S.C. § 510(c) (authorizing a bankruptcy court to subordinate any and all claims for equitable reasons). The court ruled that, under traditional principles of equitable subordination, all claims based on stock redemption notes must be subordinated.  Id. at 720-22.  Hence, insofar as the appellant's claim was based on the Note, it had to be equitably subordinated. Id. at 722.  Consistent with these holdings, the court transferred the appellant's interest in the Attachment to the bankruptcy

estate, see 11 U.S.C. § 510(c)(2), and confirmed the debtor's plan of reorganization.[2]

The appellant unsuccessfully appealed the subordination order to the district court. See In re Merrimac Paper Co., 317 B.R. 215, 223 (D. Mass. 2004) (Merrimac II); see also 28 U.S.C. § 158(c). This timely appeal followed.[3]

## II.  ANALYSIS

Although we serve as a second tier of appellate review, we "cede no special deference to the district court's initial review." In re Bank of New Engl. Corp., 364 F.3d 355, 361 (1st Cir. 2004). Rather, we review directly the bankruptcy court's determination, scrutinizing its findings of fact for clear error and its conclusions of law de novo. In re Carp, 340 F.3d 15, 21 (1st Cir. 2003). The application of the Bankruptcy Code to the facts as found (or, as here, to undisputed facts) presents a mixed question of law and fact, reviewable for clear error "unless the bankruptcy court's analysis was based on a mistaken view of the legal principles involved." Id. at 22; see also In re Indep. Eng'g Co., 197 F.3d 13, 16 (1st Cir. 1999).

_____

[2]The plan of reorganization provides that if the appellant successfully appeals the subordination ruling(s), he will have a secured claim (subject to further challenge) to the extent of the Attachment and an unsecured claim for the balance. Funds have been escrowed to assure the implementation of this arrangement. See Merrimac I, 303 B.R. at 712 & n.2.

[3]We acknowledge with appreciation the helpful amicus brief and oral argument proffered by the United States Department of Labor.

-10-

The threshold question here involves the precise nature of the claims that are subject to review. The debtor argues that we should review only the propriety vel non of equitable subordination of the Note claim, as any ERISA claim distinct from the Note claim was never properly pleaded (or, if properly pleaded, was waived). The appellant disputes this characterization of the record, but insists that, in all events, such issues are superfluous. He submits that were we to reverse the bankruptcy court's ukase equitably subordinating the Note claim, he will obtain complete relief whether or not his ERISA claim was properly pleaded or punctiliously preserved.

We agree with the appellant. And because we hold that equitable subordination of the Note claim was unwarranted here, see text infra, we need not decide independently the propriety of the bankruptcy court's subordination of what it viewed as the appellant's separate ERISA claim under section 510(b).

### A.  **Equitable Subordination**.

Section 510(c) of the Bankruptcy Code provides in pertinent part that a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1). The Code does not elaborate upon the nature of these principles, but the Supreme Court has made clear that in administering this section, the starting point should

be the compendium of judge-made principles of equitable subordination that existed prior to 1978 (when Congress enacted the Bankruptcy Code). See United States v. Noland, 517 U.S. 535, 539 (1996). This is not to say that section 510(c) froze pre-1978 law in place. The federal courts have latitude to tweak preexisting equitable principles and to develop new ones. See id. at 540.

The contours of equitable subordination are well delineated in a Fifth Circuit opinion, In re Mobile Steel Co., 563 F.2d 692 (5th Cir. 1977) (an opinion that the Noland Court deemed "influential," 517 U.S. at 538). First, equitable subordination demands that the claimant be found to have engaged in inequitable conduct. Mobile Steel, 563 F.2d at 700. Second, the misconduct must have either resulted in injury to creditors or given the claimant an unfair advantage. Id. Third, equitable subordination of the claim must not be in conflict with the provisions of federal bankruptcy law. Id. This court has adopted Mobile Steel as the gold standard for section 510(c) cases. See In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1353 (1st Cir. 1992).

In the case at hand, the debtor questions the applicability of the Mobile Steel criteria. It points to an older body of precedent in this circuit holding that stock redemption claims, as a class, are subject to equitable subordination without any showing of inequitable conduct on the claimant's part. See Matthews Bros. v. Pullen, 268 F. 827 (1st Cir. 1920); Keith v.

-12-

Kilmer (In re Nat'l Piano Co.), 261 F. 733 (1st Cir. 1919). This line of authority derives from the general precept that stockholders may not receive any of the assets of an insolvent corporation until the corporation's creditors are paid in full. See, e.g., In re Geneva Steel Co., 281 F.3d 1173, 1181 n.4 (10th Cir. 2002) ("Under [the absolute priority rule], unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated."). The driving force behind decisions such as Matthews Bros. and Keith is the desire to prevent stockholders from subverting this precept by structuring hastily engineered stock redemption agreements as a means of substituting debt for equity (and, thus, sharing company assets ratably with creditors). See Keith, 261 F. at 734 (holding that "a stockholder, contracting with the corporation . . . for the benefit of himself," may not "through an executory contract, cease to be a stockholder, and become a creditor, to share in competition with other creditors in the assets of the corporation when bankrupt"); see also Matthews Bros., 268 F. at 828 (clarifying that Keith applies even though the parties acted in good faith and the corporation was solvent when the stock redemption agreement was executed).

Keith and Matthews Bros. long predated both the Bankruptcy Code and the enactment of ERISA. Nevertheless, lower courts have taken the position that such categorical "no-fault"

subordination remains appropriate under section 510(c) with respect to claims emanating from stock redemption agreements. See, e.g., In re Main St. Brewing Co., 210 B.R. 662, 665-66 (Bankr. D. Mass. 1997); In re New Era Packaging, Inc., 186 B.R. 329, 335-36 (Bankr. D. Mass. 1995); In re SPM Mfg. Corp., 163 B.R. 411, 416 (Bankr. D. Mass. 1994). The primary support for the continued application of these hoary precedents comes from statements made during floor debates incident to passage of the 1978 bankruptcy bill, whose sponsors noted, in joint statements, that existing case law would help to establish the principles of equitable subordination. See 124 Cong. Rec. 32398 (1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 6436, 6452; 124 Cong. Rec. 33998 (1978) (statement of Sen. DeConcini), reprinted in 1978 U.S.C.C.A.N. 6505, 6521; see also SPM Mfg., 163 B.R. at 414 (quoting joint floor statement for proposition that, "under existing case law, a claim is generally subordinated . . . [if] the claim itself is of a status susceptible to subordination, such as a penalty"). Those courts believed that stock redemption claims, like penalties, were susceptible of subordination based on their essential nature. So too the bankruptcy court in the instant case, which accepted this reasoning in subordinating the appellant's claim. Merrimac I, 303 B.R. at 720-23.

The district court was more cautious. It recognized that we had not reaffirmed our turn-of-the-century precedents since the

-14-

passage of section 510(c), but ultimately concluded that the categorical rule of Keith and Matthews Bros. would survive. Merrimac II, 317 B.R. at 221. The court based this conclusion on our 1986 affirmance, without opinion, in Liebowitz v. Columbia Packing Co., 56 B.R. 222 (D. Mass. 1985), aff'd, 802 F.2d 439 (1st Cir. 1986) (table). See Merrimac II, 317 B.R. at 221.

Liebowitz, however, is a very slender reed. Our opinion is unpublished and unpublished opinions have no precedential force. See United States v. Meade, 110 F.3d 190, 202 n.23 (1st Cir. 1997); see also 1st Cir. R. 32.3(a)(2). Thus, our affirmance in Liebowitz is of no consequence. More importantly, two Supreme Court cases decided subsequent to Liebowitz dispel any notion that a bankruptcy court must categorically impose equitable subordination merely because a claim arises out of a note taken in connection with a redemption of corporate stock.

The first of these cases is Noland. There, the Internal Revenue Service (IRS) filed a post-petition claim for a noncompensatory tax penalty against a bankrupt corporation. Noland, 517 U.S. at 536. Such a claim ordinarily would be entitled to first priority in bankruptcy as an administrative expense. See 11 U.S.C. §§ 503(b)(1)(C), 507(a)(1). Although the bankruptcy court found no misconduct on the part of the IRS, it ordered the penalty claim equitably subordinated under section 510(c) to avoid the perceived unfairness of allowing the IRS to take precedence

-15-

over secured and unsecured creditors who had given value to the business. The Sixth Circuit affirmed, looking to the legislative history of the Bankruptcy Code and holding that a tax penalty claim could be subordinated, even in the absence of inequitable conduct on the claimant's part. In re First Truck Lines, Inc., 48 F.3d 210, 214-18 (6th Cir. 1995).

The Supreme Court reversed. It made clear that the matter of equitable subordination had to be approached at a judicial rather than legislative level. Noland, 517 U.S. at 543. Thus, section 510(c)'s reference to "principles of equitable subordination" would permit a court sitting in equity to "make exceptions to a general rule when justified by particular facts." Id. at 540. Such case-by-case adjudication is at the core of judicial competence.

The Court made equally clear, however, that courts were not authorized to subordinate entire classes of claims based "not on individual equities but on the supposedly general unfairness" of preferring that class of claims over another. Id. at 540-41. Such categorical judgments are legislative in nature; they "are not dictated or illuminated by principles of equity and do not fall within the judicial power of equitable subordination." Id. at 541 (quoting In re Burden, 917 F.2d 115, 122 (3d Cir. 1990) (Alito, J., concurring in part and dissenting in part)). The Court emphasized that "Congress could have, but did not, deny . . . tax penalties

-16-

the first priority given to other administrative expenses," and ruled that "bankruptcy courts may not take it upon themselves to make that categorical determination under the guise of equitable subordination." Id. at 543.

In delineating the scope of the bankruptcy court's authority to subordinate claims under section 510(c), the Noland Court specifically rejected any contrary intimations found in the legislative history. In language that leaves no room for interpretation, the Court specifically stated that, as a fundamental matter, the legislative history of section 510(c) "cannot be read to convert statutory leeway for judicial development of a rule on particularized exceptions into delegated authority to revise statutory categorization." Id. at 542. Finally, despite its earlier endorsement of Mobile Steel as the benchmark of equitable subordination, the Court expressly declined to rule that equitable subordination was unavailable merely because the IRS was not guilty of misconduct. See id. at 543 (leaving open the question of whether "a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated".

In the same year, the Court decided United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213 (1996). There, the IRS had filed a proof of claim under 26 U.S.C. § 4971(a), a statute that imposed a 10% tax on the "accumulated funding deficiency" of certain corporate pension plans. Id. at

216. The IRS sought to classify its claim as one for excise taxes in order to receive priority under what is now 11 U.S.C. § 507(a)(8)(E). The bankruptcy court held that the claim did not qualify as such. Reorganized CF & I, 518 U.S. at 216-17. The claim was thus classified as an unsecured claim in the corporation's Chapter 11 reorganization plan, but the bankruptcy court nevertheless subordinated it to the claims of general unsecured creditors based on its status as a penalty. Id. at 227.

The Supreme Court again reversed. The Court noted that the case was different than Noland in that "Noland passed on the subordination from a higher priority class to the residual category . . . whereas here the subordination was imposed upon a disfavored subgroup within the residual category." Id. at 229. Still, the Court read Noland as standing for the proposition that the "categorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority" with respect to equitable subordination under section 510(c). Id.

These two cases make it transparently clear that the bankruptcy court erred in subordinating both the secured and unsecured portions of the appellant's claim. The appellant has a non-priority claim based on the Note, but — just as in CF & I — the bankruptcy court's decision to subordinate the claim was not

-18-

premised on the specific facts of the case but, rather, on the taxonomic status of the claim.  See Merrimac I, 303 B.R. at 722.

The debtor attempts to resist this conclusion by contending that stock redemption claims, as a class, are subject to no-fault equitable subordination under Keith and Matthews Bros.  It cites SPM Manufacturing as a "leading" bankruptcy court decision holding that this rule survives the passage of the Bankruptcy Code. We reject this contention, as it fails to take into account the Noland Court's unambiguous repudiation of the legislative history upon which the SPM Manufacturing court relied.[4]

To be sure, the debtor tries to distinguish Noland on the ground that "it focuses exclusively on whether a bankruptcy court can categorically subordinate . . . claims that Congress specifically chose to treat as priority claims."  Appellee's Br. at 20.  In its view, Noland "does not take away a bankruptcy court's ability to [equitably] subordinate . . . types of claims to which Congress has not assigned a specific priority."  Id.  Conspicuously absent from this line of argument is any acknowledgment of Reorganized CF & I, which clearly and directly rejected the very distinction that the debtor now strives to draw.  See Reorganized CF & I, 518 U.S. at 229.  Taken together, the principles enunciated

---

[4]The debtor's reliance on other pre-Noland cases is equally misplaced.  Indeed, one of those cases, In re Burden, 917 F.2d 115 (3d Cir. 1990), was specifically rejected in Noland.  See 517 U.S. at 538-40.

-19-

in Noland and Reorganized CF & I vividly demonstrate why the bankruptcy court erred in equitably subordinating the appellant's claim based on nothing more than its classification as a stock redemption claim.

We do not lightly discard our prior precedents. Stare decisis must yield, however, when a "preexisting panel opinion is undermined by subsequently announced controlling authority, such as a decision of the Supreme Court." Eulitt v. Me., Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004). Here, the decisions in Noland and Reorganized CF & I, read together, constitute such supervening authority. We therefore abrogate the categorical rule of Keith and Matthews Bros. and hold that claims founded on stock redemption notes are not to be automatically subordinated solely on the basis of their intrinsic nature.

We do not, however, entirely reject the reasoning of Keith and Matthews Bros. Indeed, we believe the core principle of these decisions — that equity holders should not be able artificially to evade the debt-over-equity paradigm — is generally sound. But what Noland and Reorganized CF&I tell us is that even if claims arising out of stock redemption notes generally should be regarded as suspect, and thus subject to subordination, a court sitting in equity must nonetheless consider whether subordinating a particular claim would be fair based on the totality of the circumstances in the individual case. Cf. Noland, 517 U.S. at 540

-20-

(holding that although penalty claims cannot be categorically subordinated, they may be subordinated on a case-by-case basis).

We add a coda. Our prior cases adopting the first prong of <u>Mobile Steel</u>, <u>see</u>, <u>e.g.</u>, <u>604 Columbus Ave. Realty Trust</u>, 968 F.2d at 1353, did not deal with the type of situations described in <u>Keith</u> and <u>Matthews Bros.</u>. This fact, combined with the <u>Noland</u> Court's specific reservation of the question, 517 U.S. at 543, leaves it far from clear whether the inequitable conduct requirement would apply in such circumstances. As we have said, however, that is a question for another day.

## B. **The Equities**.

Our holding that stock redemption claims, as a class, may not automatically be subjected to equitable subordination does not end our odyssey. We therefore turn to the case-specific inquiry that the bankruptcy court failed to undertake: do the equities of this case support the equitable subordination of the appellant's stock redemption note claim? In undertaking this assessment, we begin with an explanation of the statutory mechanism underpinning the creation and use of ESOPs. An ESOP is an oddity among ERISA plans. It serves three discrete purposes: it functions as an employee retirement benefit plan, as a device for increasing a corporation's capitalization, and as a method of fostering loyalty. <u>See</u> <u>Lalonde</u> v. <u>Textron, Inc.</u>, 369 F.3d 1, 4 n.7 (1st Cir. 2004). Notwithstanding the fact that its focus is on investing exclusively

-21-

in company stock, an ESOP is considered a "stock bonus plan" and, as such, must meet various regulatory benchmarks prescribed by Congress and by the Secretary of the Treasury.  29 U.S.C. § 1107(d)(6)(A).  The benchmarks include a mandate that an ESOP must satisfy the cash distribution requirement of section 409(h) of the Internal Revenue Code.  See 26 U.S.C. § 401(a)(23).  That section provides that beneficiaries of such a plan may demand their share of employer securities upon retirement, id. § 409(h)(1)(A), and "if the employer securities are not readily tradable on an established market," a retiring employee may "require that the employer repurchase [the] employer securities under a fair valuation formula," id. § 409(h)(1)(B).

This latter choice is the put option, and its exercise is limited to a relatively brief interval following separation from service (by retirement or otherwise).  See id. § 409(h)(4).  When an employer is subject to the put option (i.e., when, and only when, its stock is not readily tradable), the employer may elect to pay the repurchase price over a period not to exceed five years. Id. § 409(h)(5)(A).  Once that election is made, the employer must post adequate security.  Id. § 409(h)(5)(B).

Having limned the origins of the Note, we look next to the equities of subordinating the appellant's claim.  Any case-by-case analysis of the equities of subordinating a particular claim that arises out of a stock redemption must begin with an

-22-

examination of whether the underlying rationale for the Keith rule applies. In a pre-Noland case, the Seventh Circuit described that rationale as follows:

> [Stock redemption] claims are, in substance, based on equity interests. When [the holders of those claims] invested in [the corporation], they positioned themselves to benefit if the company performed well, but they also accepted the risk that the company might perform poorly. Thus [they] accepted risks and benefits that . . . unsecured creditors did not, and as such their equity interests were legally subordinate to possible claims of unsecured creditors.

Matter of Envirodyne Indus., Inc., 79 F.3d 579, 583 (7th Cir. 1996). This rationale does not apply to the appellant's claim for several reasons.

First, the stock redemption transaction in this case occurred within the ERISA framework. That matters because a participant in an ERISA plan does not assume the same levels of risk as a typical equity investor. Indeed, one of ERISA's principal purposes is to minimize risks to a participant's retirement benefits. See 29 U.S.C. § 1001(b); see also Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375 (1980) (stating that ERISA seeks to ensure that "if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested benefit — he will actually receive it"). Thus, although the employee's position entails market risk during the period of

-23-

employment (the ESOP holds the stock in trust for its participants, and so the employee is, functionally, a stockholder), ERISA seeks to eliminate that risk once retirement occurs. The ordinary repurchase by a company of its stock carries with it the implied condition that payment is contingent on the fulfillment of obligations to other creditors. Cf. Robinson v. Wangemann, 75 F.2d 756, 757-58 (5th Cir. 1935) (implying the existence of such a condition). The mandates of ERISA, however — particularly its requirement that the holders of ESOP-spawned stock redemption notes be given adequate security — argue persuasively against the implication of any such condition where an ERISA-qualified ESOP is involved.

We add, moreover, that this Note is not (and should not be treated as) an ordinary stock redemption note because classifying it as such would elevate form over substance. ERISA's statutory scheme, taken as a whole, ensures that even though an ESOP is denominated as a "stock ownership plan," it offers retirees a choice between continued stock ownership and a pecuniary retirement benefit. It gives that choice to the employee by giving him, in the first instance, an unqualified right to demand stock. If there is a ready market for the stock, the employee can convert it into cash quite easily. If, however, the employer's shares are not readily tradeable, ERISA makes certain that the ESOP provides him an equivalent mechanism for converting the stock into cash.

So it was here. When the appellant's ESOP benefits came due, he elected not to take stock ownership in the debtor, preferring instead to convert shares that were not readily tradable into cash. The debtor honored that election. It chose, however, to defer a portion of its payment obligations. By structuring the transaction to play out over time, the debtor placed the appellant in his present predicament as a noteholder.

This chronology helps to explain why the appellant's claim for payment due on the Note should not be viewed in the same light as claims arising from stock redemption notes that have a more conventional genesis. The appellant's election made manifest his intention to refrain from becoming an equity investor (with all the risks attendant thereto). Under these circumstances, there is a strong policy argument that the Note should be viewed for what it is: a note received in partial payment of retirement plan benefits.

To sum up, it is readily evident that the Note on which the appellant's claim is based did not arise from a conventional stock redemption. Thus, the underlying rationale for no-fault equitable subordination is so severely undercut as to be worthless. Here, moreover, the lower courts gave no other reason, cognizable in equity, for subordinating the appellant's claim.

In other circumstances, we might remand for further proceedings; after all, an individualized assessment of what a

creditor did or failed to do in relation to his claim ordinarily entails questions of fact. This case, however, is one in which the nature of the appellant's conduct is undisputed. Under such circumstances, a remand would serve no useful purpose. There is no evidence of any misconduct attributable to the appellant nor does anything about his behavior offer the slightest reason for equitable subordination. We hold, therefore, that there is no equitable basis for subordinating the appellant's claim under 11 U.S.C. § 510(c)(1).[5] This holding necessarily results in the reversal of the bankruptcy court's transfer of the Attachment based on section 510(c)(2), as a lien can only be transferred under that section when the underlying claim has been equitably subordinated. See id. 510(c)(2).

## III. CONCLUSION

We need go no further. Consistent with the Supreme Court's recent case law, we hold that bankruptcy courts may not categorically subordinate classes of claims based on generalized policy considerations. Instead, they must exercise their equitable discretion to decide whether or not to subordinate particular claims on a case-by-case basis. Given the facts of this case, we hold as a matter of law that it was improper for the bankruptcy court, in the absence of misconduct on the part of the note holder

---

[5]We do not answer the broader question, left open in Noland, of whether the lack of creditor misconduct is itself dispositive.

-26-

or any other special circumstance, to impose equitable subordination on a claim that arises from a promissory note received in connection with the deferred payment of retirement benefits under an ERISA-qualified ESOP. Accordingly, the decisions below must be reversed.

**We reverse the order of the district court equitably subordinating the appellant's claim and transferring the Attachment, remand the case to the district court, and direct that court to remand the case to the bankruptcy court with such instructions as may be necessary to carry out our holding.** **Costs shall be taxed in favor of the appellant**.