FILED

MAR 08 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. NC-11-1426-DHSa |
| | ) | |
| SWIFT INSTRUMENTS, INC., | ) | Bk. No. 06-50896-CN |
| | ) | |
| Debtor. | ) | Adv. No. 09-5335-CN |
| _____ | ) | |
| | ) | |
| CAROLYN WU, Chapter 7 Trustee, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| STEPHEN H. SWIFT TRUST; ANNE | ) | |
| H. SWIFT; STEPHEN H. SWIFT; | ) | |
| SAMUEL H. SWIFT; QTIP TRUST # | ) | |
| OF HUMPHREY H. SWIFT TRUST - | ) | |
| 1966 U/I DATED AUGUST 1, 1966, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Submitted on January 19, 2012
at San Francisco, California

Filed - March 8, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Charles Novak, Bankruptcy Judge, Presiding

_____

Appearances:   Kevin W. Coleman of Schnader Harrison Segal & Lewis
LLP for Appellant Carol Wu; Marcia Gerston of Trepel
Greenfield Sullivan & Draa, LLP for Appellee QTIP

_____

[1]     This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8013-1.

1

Trust #2 of Humphrey H. Swift Trust, 1966 U/I Dated August 1, 1966; and Dennison Gallaudet, Trustee of the Stephen H. Swift Trust, pro se.

---

Before: DUNN, HOLLOWELL, and SALTZMAN,[2] Bankruptcy Judges.

On the record submitted to the Panel, we AFFIRM the bankruptcy court's summary judgment determination that certain claims are not subject to subordination pursuant to § 510(b).[3]

## I. FACTS

By agreement dated June 19, 1952 ("1952 Stock Restriction Agreement"), Swift and Anderson, Inc., predecessor in interest to Swift Instruments, Inc. ("Debtor"), agreed to repurchase and pay for all the stock held by stockholders Stephen H. Swift ("Stephen") and Humphrey H. Swift ("Humphrey") upon their deaths. The terms of repayment were to be "one-fifth of the purchase price in cash and [the Debtor's] promissory note or notes for four-fifths of the purchase price payable in four equal annual installments with interest at five per cent upon the unpaid balance. . . ." By an amendment ("1993 Amendment") to the 1952 Stock Restriction Agreement, dated June 25, 1993, the terms of repayment were changed to provide that one-twelfth of the purchase price was payable in

---

[2]     Hon. Deborah J. Saltzman, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[3]     Unless otherwise specified, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

2

cash, with the eleven-twelfths balance to be paid by the Debtor's promissory note or notes in eleven equal installments with simple interest at five percent on the unpaid balance. The 1993 Amendment stated that the 1952 Stock Restriction Agreement was "still in effect solely with respect to [Stephen]."[4] The 1993 Amendment was acknowledged and agreed to by the Stephen H. Swift and Caroline H. Swift Settlement Trust dated March 17, 1969 ("Divorce Settlement Trust"), and by the beneficiaries under the Divorce Settlement Trust: Stephen Hyde Swift, Anne Hathaway Swift and Samuel Hyde Swift. As relevant to this appeal, the Divorce Settlement Trust was funded by some of Stephen's shares in the Debtor.

Stephen died in 1997. Under his will, the 1000 Debtor shares Stephen still owned personally were transferred to the Stephen H. Swift Trust ("SHS Trust"). At the time of Stephen's death the stock was valued at $100.65 per share. In accordance with the 1952 Stock Restriction Agreement and the 1993 Amendment, the Debtor was obligated to repurchase the SHS Trust's shares for a total purchase price of $110,650. One-twelfth of that amount was paid in cash, and the Debtor issued a promissory note dated December 1, 1997 for the $101,429.13 balance.[5]

---

[4] Notwithstanding this statement, Humphrey still was living and remained a party to the 1952 Stock Restriction Agreement.

[5] At the time of Stephen's death, Stephen Hyde Swift, Anne Hathaway Swift and Samuel Hyde Swift each received individual promissory notes for their respective interests attributable to Stephen's stock owned by the Divorce Settlement Trust. Stephen Hyde Swift, Anne Hathaway Swift and Samuel Hyde Swift although named as appellees did not participate in this appeal.

3

After Stephen's death, Humphrey and the remaining shareholders of the Debtor executed an "Amended and Restated Stock Restriction Agreement" dated October 12, 1999 ("1999 Restated Agreement").[6] Substantial changes were made to the terms for required repurchase and payment for Humphrey's stock upon his death.

Humphrey died on January 20, 2002. Upon his death, his estate sold his shares[7] to the Debtor in accordance with the 1999 Amended and Restated Agreement. The Debtor made a partial payment of $788,560.44 to Humphrey's estate, using proceeds from a life insurance policy bought for that purpose.[8] The Debtor then executed two promissory notes, payable to Humphrey's estate for the balance of the repurchase price for his shares. The first note, dated

---

[6] Paragraph 14 of the 1999 Restated Agreement recited that prior stockholder agreements, including the 1952 Stock Restriction Agreement and other agreements dated October 10, 1960 and April 28, 1975, previously were rescinded and cancelled. The 1999 Restated Agreement purported to amend and restate the agreement dated September 15, 1977 between the Debtor and certain shareholders regarding the transfer of stock. Only the 1952 Stock Restriction Agreement is included in the record on appeal.

[7] Excluded from Humphrey's shares subject to repurchase by the Debtor were shares that Humphrey left to his daughter, Alison, who succeeded to Humphrey's position as Chief Executive Officer of the Debtor upon his death.

[8] The 1999 Restated Agreement required the Debtor, upon the death of Humphrey, to use the entire proceeds of the "key man" life insurance policy on Humphrey to redeem in cash all stock held by shareholder Harold Mercer. Any remaining proceeds were to be used to purchase Humphrey's stock. As a result, Humphrey's estate received a cash payment equivalent to 25% of the value of Humphrey's stock at the time of his death, rather than the one-twelfth cash payment otherwise contemplated.

4

June 24, 2002, was in the amount of $1,635,551.21; the second note, dated March 13, 2003, was in the amount of $337,238.68. These notes were consolidated into a single note dated April 15, 2003, in the amount of $2,012,749.89, made payable to the QTIP Trust #2 of The Humphey H. Swift Trust - 1966 u/I, dated August 1, 1966 ("HHS Trust"), based upon an assignment, also dated April 15, 2003.

As early as October 2002, the Debtor began negotiations with the holders of the promissory notes representing the unpaid balances for the repurchase of Stephen and Humphrey's shares to alter their terms. Between 1998 and 2002, Debtor's overall sales declined by 27% with no corresponding decline in its operating expenses. By letter dated November 29, 2002, the Debtor advised Humphrey's estate that it would be unable to make the payments due in June 2003 on the outstanding promissory notes without creating an "emergency liquidation situation." In March 2003, the Debtor proposed to convert 75% of the outstanding balances on the promissory notes due Humphrey's estate to equity. Instead, the parties agreed to restructure the obligation reflected in the note, now payable to the HHS Trust, by deferring principal payments for approximately four years. In exchange for the deferral, the HHS Trust was given a warrant for 10% of the amount of the Debtor's current outstanding stock at a $1.00 per share exercise price. To effectuate the restructuring, the Debtor executed a Restated Promissory Note payable to the HHS Trust, dated January 31, 2004, in the amount of

///

///

5

$2,177,402.87.[9]

The Debtor made the quarterly interest only payments on the restated promissory notes to Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust through the payment due September 2005.

On May 24, 2006, the Debtor filed a voluntary chapter 11 petition.  The following claims were filed based upon the promissory notes for Debtor's repurchase of Stephen and Humphrey's stock:

- Claim No. 25, filed by Anne Hathaway Swift, asserting a general unsecured claim in the amount of $299,020.19.

- Claim No. 29, filed by the SHS Trust, asserting a general unsecured claim in the amount of $80,336.63.

- Claim No. 39, filed by Stephen Hyde Swift, asserting a general unsecured claim in the amount of $234,746.90.

- Claim No. 49, filed by Samuel Hyde Swift, asserting a general unsecured claim in the amount of $226,407.09.

- Claim No. 31, filed by the HHS Trust, asserting a general

[9]    The record on appeal suggests that with respect to the promissory notes relating to the repurchase of Stephen's stock, the promissory notes held by Stephen Hyde Swift, Anne Hathaway Swift and Samuel Hyde Swift also were restructured on January 31, 2004, but not the promissory note held by the SHS Trust. See (1) allegations in the complaint (paragraphs 15-17, 23 and 29), (2) the answers filed by the SHS Trust, by Stephen Hyde Swift, and by Samuel Hyde Swift (if Anne Hathaway Swift filed an answer to the complaint, it is not included in the record on appeal), and (3) SHS Trust's memorandum in support of its motion for summary judgment ("The SHS Trust was not asked to participate and did not participate in this exchange [for a restated promissory note] and holds no warrants to purchase stock of the Debtor.").

unsecured claim in the amount of $2,265,095.53.

The bankruptcy court entered an order converting the case to chapter 7 on November 28, 2007, and Carol Wu was appointed the chapter 7 trustee ("Trustee"). On December 16, 2009, the Trustee filed her complaint pursuant to § 510(b) of the Bankruptcy Code, seeking to subordinate the claims represented by the promissory notes to claims of general unsecured creditors.[10]  In their answers to the complaint, all defendants asserted that the Trustee was not entitled to equitable subordination of their claims pursuant to § 510(b) because not only were they not, nor had they ever been, equity owners and/or shareholders of the Debtor, but the Stock Repurchase Agreement by its terms precluded them from being shareholders.

The Trustee, the SHS Trust and the HHS Trust all filed cross-motions for summary judgment.  None of the summary judgment motions are in the record on appeal.  The only pleadings filed in connection with the summary judgment motions included in the record before the

---

[10]  The Trustee's claim for relief for avoidance of transfers (the quarterly interest payments in the year before the Debtor filed its bankruptcy petition) against Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust, were dismissed as untimely pursuant to § 546.  No appeal was taken from that determination of the bankruptcy court.

The Trustee also sought to disallow the claims of Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust on the basis that they failed to return the alleged preferential transfers.  The bankruptcy court did not grant summary judgment on this claim for relief.  However, the Trustee has stipulated to the dismissal of this claim for relief as to all defendants.

7

Panel are: the memorandum of the SHS Trust in support of its motion for summary judgment, the identical declarations of Preston H. Saunders filed (1) September 3, 2010 in support of HHS Trust's motion for summary judgment and (2) October 10, 2010 in opposition to the Trustee's motion for summary judgment, and the identical declarations of Alison C. Swift filed (1) September 3, 2010 in support of HHS Trust's motion for summary judgment and (2) October 10, 2010 in opposition to the Trustee's motion for summary judgment.

On December 14, 2010, the bankruptcy court entered its Memorandum Decision and Order Granting Motion for Summary Judgment ("Memorandum Decision"), stating that all parties have agreed that no questions of fact exist regarding the Trustee's § 510(b) claim for relief, and that "this court's sole task is to interpret that code section and apply it to the undisputed facts." Holding that § 510(b) is "aimed at equity interests attempting to elevate their claim," the bankruptcy court ruled that, in light of the mandate in the 1952 Stock Restriction Agreement that the Debtor repurchase Stephen and Humphrey's shares upon their deaths, the defendants were seeking only to enforce their debt instruments, i.e. the promissory notes, and were not asserting claims that relied on or were tied to the value of the Debtor's stock, or to recharacterize a securities or equity claim as debt. On July 25, 2011, the bankruptcy court entered judgment in favor of the defendants on the Trustee's § 510(b) claim for relief, and the Trustee timely appealed.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUE

Whether the bankruptcy court erred when it ruled that the claims of the SHS Trust, Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust were not subject to subordination under § 510(b).

## IV.  STANDARDS OF REVIEW

We review de novo a decision to grant summary judgment.  See FTC v. Stefanchik, 559 F.3d 924, 927 (9th Cir. 2009).  De novo review requires that we view the case from the same position as the bankruptcy court.  See Lawrence v. Dep't of Interior, 525 F.3d 916, 920 (9th Cir. 2008).  In our review of the grant of a motion for summary judgment, we are governed by the same standard used by the bankruptcy court under Civil Rule 56(c), applicable in the adversary proceeding pursuant to Rule 7056.  See Suzuki Motor Corp. v. Consumers Union, Inc., 330 F.3d 1110, 1131 (9th Cir.), cert. denied, 540 U.S. 983 (2003).  Summary judgment may be appropriate when a mixed question of fact and law involves undisputed underlying facts. See EEOC v. UPS, 424 F.3d 1060, 1068 (9th Cir. 2005).

We also review de novo the bankruptcy court's interpretation of a statute, including provisions of the Bankruptcy Code.  See Beeman v. TDI Managed Care Svcs., 449 F.3d 1035, 1038 (9th Cir. 2006).

9

## V. DISCUSSION

At the outset, we note the difficulty imposed on us by the Trustee's failure to provide a complete record of what was presented to the bankruptcy court. Although "[c]omprehensive briefs were filed and an extended oral argument took place"[11] before the bankruptcy court, the only summary judgment pleadings we have in the record before us are (1) the memorandum filed by the SHS Trust in response to the Trustee's motion for summary judgment, and (2) two declarations, without the referenced exhibits attached, that were filed in support of HHS Trust's position in opposition to the Trustee's motion for summary judgment and in support of its own. We have no transcript of the "extended oral argument" on the cross-motions for summary judgment. The Trustee's failure to provide a complete record of material pleadings and documents, as well as the hearing transcript, in itself constitutes a basis to dismiss this appeal or summarily affirm the bankruptcy court's decisions. See Kyle v. Dye (In re Kyle), 317 B.R. 390, 393 (9th Cir. BAP 2004); Ehrenberg v. Cal. State Univ., Fullerton Found. (In re Beachport Entm't), 396 F.3d 1087-88 (9th Cir. 2005) (When the inadequacy of the record provided to the Panel affords little choice but to summarily affirm, we may do so.).

The problem created by the lack of record manifests itself, in part, in this way: "Ordinarily, we do not consider arguments that were neither raised nor addressed before the bankruptcy court."

---

[11]   HHS Trust's Opening Brief on Appeal at p. 6.

10

*Charlie Y., Inc. v. Carey (In re Carey)*, 446 B.R. 384, 393 (9th Cir. BAP 2011), citing *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 168-69 (2004). Because we do not have before us any memorandum the Trustee may have filed either in support of her own motion for summary judgment or in opposition to the cross motion filed by the HHS Trust or the transcript of the argument on the cross motions, we do not know what arguments included in the Trustee's Opening Brief on Appeal ("Trustee's Opening Brief") were presented to the bankruptcy court.

The Trustee makes three arguments in this appeal. First, the bankruptcy court erred in its interpretation and application of the Ninth Circuit's decision in *In re Betacom of Phoenix*, 240 F.3d 823 (9th Cir. 2001), which the Trustee characterizes as "[t]he controlling law in this Circuit regarding the possible subordination of promissory notes arising from a sale of securities." Trustee's Opening Brief at pp. 11-12. Second, the Trustee asserts that the assignment of the claims subject to subordination does not alter the *Betacom* analysis. *Id.* at pp. 16-19. Third, although she concedes that the bankruptcy court correctly identified the policy underlying § 510(b), the Trustee contends that the bankruptcy court erred when it focused on the form of the claim rather than analyzing the risk represented by the claim. Because the bankruptcy court's Memorandum Decision contains no discussion of the legal effect of assignment, we presume the argument was not raised by the Trustee and therefore

///

///

11

conclude that the Trustee waived that argument on appeal.[12]

We therefore limit our de novo review to the bankruptcy court's interpretation and application of § 510(b).

Section 510(b) provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security except that if such security is common stock, such claim has the same priority as common stock.

The principal cases in this circuit with respect to § 510(b) are Betacom and American Wagering.[13]  In Betacom, the Ninth Circuit ruled that a claim for damages for breach of a merger agreement was properly subordinated under § 510(b) where the alleged breach was the corporation's failure to convey shares of stock.  In reaching that decision, the Ninth Circuit suggested that assessing the application of § 510(b) to any claim requires an analysis of "the two main rationales for mandatory subordination: 1) the dissimilar

_____

[12]   In any event, it appears that the issue of assignment is irrelevant in the bankruptcy court's analysis.  The bankruptcy court points out that, "No one contests that the notes result from the Stock Restriction Agreement purchases."  Memorandum Decision at p. 6 n.7.  The bankruptcy court also states that the defendants, "and their predecessors in interest," i.e., Stephen and Humphrey's respective estates which last held actual stock, "removed themselves as equity holders when the company issued the promissory notes." Id. at 8:6-7.

[13]   In re Am. Wagering, Inc., 493 F.3d 1067 (9th Cir. 2007).

12

risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment." See, generally, Betacom, 240 F.3d at 828-30.

American Wagering concerned a claim based upon a judgment debt held by a financial advisor who had performed services relating to the initial public offering of the stock of debtor's predecessor-in-interest. Under his employment agreement, the financial advisor was to be paid $150,000 cash plus "4.5 percent of the final evaluation in the form of . . . common stock." Overruling this Panel's decision (326 B.R. 449 (9th Cir. BAP 2005)), the Ninth Circuit determined that the financial advisor's claim was not subject to subordination under § 510(b), because he never contracted to hold shares of stock, only to receive compensation measured against the value of stock. He therefore never undertook the risks of a shareholder.

The Trustee asserts on appeal that under Ninth Circuit precedent, the claims of the SHS Trust, Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust are subject to "mandatory" subordination to the claims of the Debtor's general unsecured creditors pursuant to § 510(b). The Trustee cites Betacom for the proposition that claims based on fixed payment promissory notes must be subordinated under § 510(b) if they were "linked to" the stock repurchase. The Trustee contends that § 510(b) is to be read "broadly" to include claims in which "there exists some nexus or causal relationship between the claim and the purchase of the

13

securities. . . ."  Am. Wagering, 493 F.3d at 1072.

In granting summary judgment against the Trustee, the bankruptcy court recognized that for purposes of § 510(b), the Debtor's repurchase of Stephen and Humphrey's stock constituted purchases of the Debtor's securities.  Memorandum Decision at 5:26-27.  The bankruptcy court further recognized that contract claims and even claims by persons or entities who are not and never were shareholders of the debtor are subject to § 510(b) subordination.  Id. at 5:27-6:2.  See also Betacom, 240 F.3d at 829 ("There is nothing . . . to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud."), and ("Nothing in § 510(b)'s text requires a subordinated claimant to be a shareholder.").  Finally, the bankruptcy court agreed that § 510(b) was to be interpreted broadly. Memorandum Decision at 6:6-8.  However, the bankruptcy court further stated that the critical question it had to decide for purposes of § 510(b) was whether the claims for damages for breach of contract, i.e., for Debtor's failure to pay the notes, "arose" from the Debtor's repurchase of Stephen and Humphrey's stock.

The bankruptcy court rejected the Trustee's assertion that Betacom and American Wagering required the application of a "but for" analysis, a mere nexus between the claim and the repurchase of stock.  The bankruptcy court interpreted American Wagering as requiring not simply that § 510(b) be interpreted broadly as the Trustee suggested, but rather that it be interpreted broadly "to give effect to the statute's remedial goals."  Id. at 6:6-7, citing

14

<u>Am. Wagering</u>, 493 F.3d at 1072. The bankruptcy court thus rejected a mandatory application of § 510(b) in the absence of a determination that subordinating the claims satisfied the purposes of § 510(b). <u>Id.</u> at 6:23-7:4, <u>citing</u> <u>In re JTS Corp.</u>, 305 B.R. 529, 545 (Bankr. N.D. Cal. 2003).

We agree with the bankruptcy court that it is not appropriate to adopt a rule that all claims based on stock redemption notes must be subordinated. The language of § 510(b) is not sufficiently clear to impose such a rule. The Tenth Circuit provides a good analysis both of the policies behind the addition of § 510(b) to the Bankruptcy Code and of the ambiguity of the language of § 510(b). <u>See</u> <u>Allen v. Geneva Steel Co. (In re Geneva Steel Co.)</u>, 281 F.3d 1173 (10th Cir. 2002).[14]

---

[14]  In enacting § 510(b), Congress adopted the position articulated in "an influential article written by law professors John Slain and Homer Kripke. <u>See</u> John Slain & Homer Kripke, <u>The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors</u>, 48 N.Y.U. L.Rev. 261 (1973)." <u>Geneva Steel</u>, 281 F.3d at 1176.

> Slain and Kripke criticized the favorable treatment that bankruptcy courts were extending to shareholder fraud claims. Their argument rested on the bargain and reliance interests formed by creditors and equity-holders. They pointed out that allowing equity-holders to become effectively creditors-by treating these two classes as though they were one-gives investors the best of both worlds: a claim to the upside in the event the company prospers and participation with creditors if it fails. It also dilutes the capital reserves available to repay general creditors, who rely on investment equity for
>                                                     (continued...)

15

In Betacom, the Ninth Circuit remanded two claims based on promissory notes to the bankruptcy court, with direction that the promissory note claims should be subordinated along with the claim for breach of the merger agreement, "[i]f the note claims are linked to the Merger Agreement." Betacom, 240 F.3d at 832. Thus "[although Betacom indicates that promissory note claims can be subject to mandatory subordination under appropriate circumstances, it does not describe what type of circumstances justify subordination." JTS Corp., 305 B.R. at 546. We therefore find no error in the bankruptcy court's determination that it was required to decide whether subordinating the claims would satisfy the purposes of § 510(b).[15]

---

[14](...continued)
satisfaction of their claims. Giving shareholder claims the same priority as creditor claims, reasoned Slain and Kripke, eliminates this safety cushion.

Id.

[15] This approach is similar to that enunciated by the First Circuit in the context of equitable subordination under § 510(c). Noting the Supreme Court has stated that "'categorical reordering of priorities that takes the place at the legislative level of consideration is beyond the scope of judicial authority' with respect to equitable subordination under section 510(c)," the First Circuit rejected the "rule" that all claims based on stock redemption notes must be subordinated. Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.), 420 F.3d 53, 62 (1st Cir. 2005) (quoting U.S. v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 229 (1996)). Instead, a court sitting in equity must consider whether subordinating a particular claim would be fair based on the totality of the circumstances in the individual case. Merrimac, 420 F.3d at 63.

16

> Section 510 of the Bankruptcy Code is an integral part of the scheme established in subchapter I of chapter 5 of the Bankruptcy Code. That subchapter, consisting of sections 501 through section 510, seeks to establish a fair allocation of estate assets among the many types of claimants in a liquidation or reorganization case. Subordination of a claim alters the otherwise applicable priority of that claim so that the subordinated claimant receives a distribution only after the claims of other identified creditors have been satisfied.

4 COLLIER ON BANKRUPTCY ¶ 510.01, at p. 510-3 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011).

As the Ninth Circuit explained in American Wagering, § 510(b) "serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." Am. Wagering, 493 F.3d at 1071. Betacom directs that we look to the origin of the promissory notes on which the claims are based to determine whether they should be subordinated. Betacom, 240 F.3d at 832. However, merely because the debt represented in the promissory notes is from the repurchase of Stephen and Humphrey's stock does not automatically mean that it is subject to subordination. See 4 COLLIER ON BANKRUPTCY ¶ 510.04[6] at pp. 510-15-16.

Generally, state law governs the rights and status of the claims of holders of promissory notes based on repurchased stock vis a vis other unsecured creditors of the corporation. See Butner v. U.S., 440 U.S. 48 (1979).

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property

17

> interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." <u>Lewis v. Manufacturers Nat'l Bank</u>, 364 U.S. 603, 609 . . . .

<u>Id.</u> at 55.

The 1952 Stock Restriction Agreement, the 1993 Amendment, and the 1999 Restated Agreement all were executed in Massachusetts. Although only the 1999 Restated Agreement contains a choice of law provision ("[t]his agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts"), each version of the agreement to repurchase the shares of Stephen and/or Humphrey upon his death is governed by Massachusetts law. Each of the notes payable to the HHS Trust contains the following language: "The execution, delivery and performance of this Note shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts."[16]

Under Massachusetts law, the effect on a corporation from a distribution to a shareholder which occurs by repurchase of a corporation's shares is measured by the earlier of (I) the date the debt was incurred by the corporation, or (ii) the date the shareholder ceased to be a shareholder with respect to the repurchase. Mass. Gen. Laws ch. 156D, § 6.40(e)(1). Further, a corporation's indebtedness to a shareholder created through a

---

[16] The promissory notes issued in connection with the repurchase of Stephen's stock are not in the record on appeal.

18

distribution (repurchase of shares) is at parity with the corporation's indebtedness to its general, unsecured creditors except to the extent subordinated by agreement. Id. at § 6.40(f). However,

> No distribution may be made by a corporation which is a going concern if, after giving it effect,
> (1) the corporation would not be able to pay its existing and reasonably foreseeable debts, liabilities and obligations, whether or not liquidated, matured, asserted or contingent, as they become due in the usual course of business. . . .

Id. at 6.40(c).

Thus, outside of bankruptcy, the promissory notes were simply debt instruments entitled to be paid on the same basis as the Debtor's other unsecured creditors in the absence of an evidentiary record as to the Debtor's solvency or insolvency during the relevant time periods.[17] The question we must address is whether § 510(b) requires a different outcome once the Debtor corporation is in bankruptcy. In doing so, we evaluate the claims in light of the two main reasons for § 510(b) subordination identified in Betacom: the

---

[17] While the record before us, particularly the correspondence from the Debtor to Humphrey's estate explaining that insolvency was imminent unless the terms of payment for the repurchased stock was restructured, suggests that the repurchase of Humphrey's shares may have been in violation of Mass. Gen. Laws ch. 156D § 6.40(c), the Trustee made no effort to impose subordination on that basis, certainly not based on the record before us. Accordingly, we assume for purposes of our review that the notes issued to the HHS Trust are valid.

In contrast, in its summary judgment memorandum, the SHS Trust alleged that the equity cushion for the Debtor at the time the notes for the repurchase of Stephen's shares were issued was 2.9 times the amount of the debt incurred through the repurchase.

19

dissimilar risk and return expectations of shareholders and creditors, and the reliance of creditors on the equity cushion provided by shareholder investment.

Under Mass. Gen. Laws ch. 156D, § 6.40(e)(1), any right of Stephen to be a shareholder ended in 1997, when the Debtor issued the notes for the repurchase of Stephen's stock. Thus, as to the notes issued in 1997 to the SHS Trust, Stephen Hyde Swift, Anne Hathaway Swift and Samuel Hyde Swift, those parties held the risks and return expectations of creditors based only upon the terms of the notes they held. In addition, the bankruptcy court affirmatively found that the Trustee presented no evidence that creditors had relied upon equity created by Stephen's stock in deciding whether to extend credit to the Debtor.

Under Mass. Gen. Laws ch. 156D, § 6.40(e)(1), any right of Humphrey to be a shareholder ended in 2003, when the Debtor issued the notes for the repurchase of the then remaining shares of Humphrey's stock. Thus, as to the notes issued in 2002 and 2003 to the HHS Trust, it held the risks and return expectations of a creditor based only upon the terms of the notes it held. In addition, the bankruptcy court affirmatively found that the Trustee presented no evidence that creditors had relied upon equity created by Humphrey's stock in deciding whether to extend credit to the Debtor.

The Trustee contends that the fact that the claimants (except for the SHS Trust) held stock warrants issued in connection with the Debtor's issuance of the restated promissory notes in January 2004

20

changes the analysis. We disagree. <u>Black's Law Dictionary</u> defines a stock warrant as a "[c]ertificate[] entitling the owner to buy a specified amount of stock at a specified time(s) for a specified price." Holding a stock warrant is not the equivalent of holding stock. In the January 2004 renegotiation of the notes, the Debtor issued stock warrants to Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust. None of those stock warrants ever was exercised. Further, no claim for the value of any stock or stock warrants that might fall within the ambit of § 510(b) was ever filed. The mere existence of the stock warrants does not taint the claims based upon the promissory notes at issue in this appeal. Most importantly, § 101(49)(B)(iv) specifically excludes warrants from the definition of "security" for purposes of the Bankruptcy Code.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Civil Rule 56(c). The parties agreed that no questions of fact existed with respect to the Trustee's claim for § 510(b) subordination of the claims of the SHS Trust, Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust. We have analyzed the claims under the standards set forth in <u>Betacom</u> and <u>American Wagering</u>, and we reach the same conclusion as did the bankruptcy court. The Trustee is not entitled to a judgment subordinating, pursuant to § 510(b), the Appellees' claims to the claims of other general unsecured creditors.

21

## VI.  CONCLUSION

We AFFIRM the bankruptcy court's determination that the claims of the SHS Trust, Stephen Hyde Swift, Anne Hathaway Swift, Samuel Hyde Swift, and the HHS Trust were based on debt instruments and therefore not subject to subordination pursuant to § 510(b).